STATE OF CONNECTICUT *v.* ANDREW J. NERO
(AC 30753)

Bishop, Robinson and Hennessy, Js.

Argued April 16—officially released July 27, 2010

*Jackie Chan*, with whom was *Steven Boa DeMoura*, for the appellant (defendant).

*Margaret Gaffney Radionovas*, senior assistant state's attorney, with whom, on the brief, were *Stephen J. Sedensky III*, state's attorney, and *Deborah Mabbett*, senior assistant state's attorney, for the appellee (state).

*Opinion*

BISHOP, J. The defendant, Andrew J. Nero, appeals from the judgment of conviction, following a jury trial, of attempt to commit sexual assault in the second degree in violation of General Statutes § 53a-49 and General Statutes (Rev. to 2007) § 53a-71 (a) (1),[1] attempt to commit risk of injury to a child in violation of General Statutes §§ 53a-49 and 53-21 (a) (2),[2] attempt to commit risk of injury to a child in violation of General Statutes §§ 53a-49 and 53-21 (a) (1), and attempt to entice a

---

[1] In 2007, after the defendant had been arrested and charged with violating General Statutes § 53a-71 (a) (1), the statute was amended to increase the age differential from two years to three years. See Public Acts 2007, No. 07-143, § 1. It is undisputed that the defendant was thirty-one years old at all relevant times, well above the two year age difference proscribed by § 53a-71. All subsequent references to § 53a-71 pertain to the 2007 revision.

[2] Although § 53-21 was amended by No. 07-143, § 4, of the 2007 Public Acts, those amendments have no bearing on the merits of this appeal. For convenience, we refer to the current revision of the statute.

minor by computer to engage in sexual activity in violation of General Statutes §§ 53a-49 and 53a-90a. On appeal, the defendant claims that the evidence presented at trial was insufficient for the jury to find beyond a reasonable doubt that (1) the state had disproved his defense of entrapment and (2) he was guilty of attempt to commit sexual assault in the second degree in violation of §§ 53a-49 and 53a-71 (a) (1). Additionally, the defendant claims that the trial court improperly denied his motion for a judgment of acquittal on all charges. We affirm the judgment of the trial court.

The following factual history is relevant to our review of the defendant's claims. In February, 2007, Detective Jason Frank of the Newtown police department initiated an effort to patrol Internet chat rooms for local adults attempting to initiate inappropriate sexual relationships with minors. Toward this end, Frank set up the screen name "xoconnecticutcheerleaderxo" and posed as a fifteen year old girl named Jenny, who lived in Newtown.[3] The screen name created by Frank had a corresponding personal profile, but Frank did not include Jenny's age or any other identifying information. Frank testified that he would log on to the Internet and enter a general Internet chat room for "Romance" for the location, "Connecticut." Once he was in the chat room, Frank would monitor the discussion, which was available to anyone who entered the chat room, and wait for someone to initiate a private conversation with Jenny.

On February 16, 2007, while in the romance chat room, the defendant, using the screen name

---

[3] For ease of describing the conversations between the defendant and Frank, while posing as "Jenny," we will refer to all statements by Frank's online persona, Jenny, as having been spoken by that name.

"Andrewfsx," invited Jenny to have a private conversation.[4] After exchanging names and towns of residence, the defendant told Jenny that he was a thirty-one year old man and sent her a shirtless photograph of himself. Shortly thereafter, Jenny responded by sending two photographs of herself, in both of which she was fully clothed, and she informed the defendant that she was fifteen years old and a sophomore in high school.[5] The defendant expressed some concern about Jenny's age saying, "that's not ok lol.i could go to jail."[6] He also stated during this part of the conversation that "there are cops in here all the time pretending to be girls," and, "i just don't want to go to jail," and, "i wish you were 16. .that's what you should have said." Jenny tried to end the conversation by saying, "well. . . i guesss it ur decision. . . nice 2 meet u." But the defendant persisted and said, "prove you're not a cop." After Jenny offered to do so, they both agreed that there was no way for her to prove it, and the conversation continued.

This conversation went on for approximately one hour and twenty minutes, during which the defendant initiated sexually suggestive talk by saying, "i need to see you to turn me on. .lol. . .i don't want to go on a cam just staring at this computer screen." He asked when Jenny was going to reach the age of sixteen, and Jenny told him that that would not occur for another ten months. He discussed having marijuana that he wanted to smoke and mentioned that he would love to smoke it with Jenny but that he had seen too many episodes of the television program, "Dateline,"

---

[4] This meant that their conversation was one on one and was not visible to any other individuals logged into the chat room.

[5] The photographs were, in fact, of a female police officer when she was seventeen years old.

[6] The abbreviation "lol" stands for "laugh out loud."

Unless indicated otherwise, the direct quotations from the Internet chats between the defendant and Jenny are set forth as they appear in the record, including the lack of proper grammar, capitalization and punctuation.

explaining to Jenny that it was "the show where they show all the guys picking up girls on the internet."[7] The conversation continued regarding nonillicit topics such as the television programs that Jenny watched and how she had been at private school but had to leave because she got into too much trouble and was now in the tenth grade at Newtown public high school. The defendant said, "i'd have so much fun with you." When Jenny responded in kind, the defendant said, "[G]od. . . you're driving me crazy," explaining that she was driving him crazy "cause you're only 15. .it's your fault . . . jk hehe."[8] The defendant suggested that Jenny "go away . . . change your name . . and say you're 17 lol." Jenny responded, "LOL . . . fine. . . do u want me to tell u that im 18 . . . OK. . . Im 18 . . . is that better . . . lol." The defendant replied, "it's ok."

Shortly thereafter, Jenny asked the defendant what was on his mind, and he responded, "sex and smoking . . . ." He also went on to say, "you turn me on too much" and "you make me feel special down there." When Jenny mentioned her private school uniform, he said, "yeah. . . that outfit would be hot," "i'd lift that little skirt up" and "i'd kiss you all over." In response to Jenny's question about what it is that he likes to do, he said, "make you feel so good." Immediately thereafter, the defendant asked if Jenny had her driver's license and when she said no, he said, "i wish i lived in [K]entucky or something. . .i'd pick you up in 2 seconds." Six minutes later the defendant said he had to go

---

[7] Here, the defendant was referring to the "Dateline" television program episodes called, "To Catch a Predator." On the program, the host confronts adult males when they arrive at a specified location believing that they will be meeting an underage teen whom they previously had met on the Internet for the purpose of engaging in sexual activity and, often times, drug or alcohol consumption. In reality, however, the person whom they are talking to on the Internet is someone from the television program or a law enforcement officer working in conjunction with the program.

[8] "JK" is the abbreviation for "just kidding."

to "smoke a bowl," meaning a pipe filled with marijuana, and said, "i think you are so cool. . .i'd love to see you too. . .but it's too hard now. . .and i'd love to go on cam for you. . .but i need to see your expressions and stuff." He continued, saying, "and i'd love to smoke with you. .i have no one to smoke with." When Jenny said that she could meet him if he wanted, the defendant said that he did want her to meet him. Jenny then made an excuse that her mother and father came home and that she could not go out that night. Jenny tried to end the conversation, saying, "ill let ya go and do ur thang," but the defendant persisted, asking, "what are you wearing." When Jenny said she was wearing sweatpants and a T-shirt, the defendant said, "that's hot." They said goodbye and agreed to talk again.

On February 19, 2007, Jenny contacted the defendant via instant message, but there was no response. Nearly eleven hours later, the defendant responded to Jenny, but she did not respond. The following day, February 20, 2007, Jenny responded to the message that the defendant had left the previous day, but there was no response. On February 22, 2007, the defendant contacted Jenny, but she did not respond. The following day, Jenny contacted the defendant, and seven hours later the defendant responded. They talked about their weekend plans. Jenny said she did not have plans, and the defendant replied, "cool. .maybe we'll hang . . i'll write to you." The defendant also said he was getting more marijuana and would let Jenny know when he picked it up.

On February 26, 2007, Jenny contacted the defendant, and one hour later he responded. They talked about their weekends, how Jenny had a snow day and made plans to talk later in the day. Later that evening, the defendant contacted Jenny. After some small talk, the defendant said that he was going to smoke some marijuana and asked if she wanted to smoke with him. Jenny

said that she did, and the defendant said they could just go for a ride and then he would bring her back home. Jenny said, "and u think id be able to control myself . . . u better bring something else just in case . . . hehehehe." The defendant responded, "lol. . .we'll see. . . .if i come to pick you up i'll come with nothing and then pick it up quick . . . sorry i don't totally trust you till i meet." He went on to say, "i just want to meet you for a minute [before] i bring anything you know [winking emoticon][9]. . . then we'll just drive for a sec and pick it up at my place . . . then we'll drive around for a bit till it's done . . . just to make sure you are you . . . and not someone else . . . get it." Jenny said that the defendant's behavior was making her nervous, and the defendant replied, "i am careful. . at first. . .i don't know why that would freak you out." Jenny suggested that she could tell her mom that she was taking the dog for a walk and they could meet, and then asked what exactly the defendant had in mind. He responded that he just wanted to meet and to go for a drive. Jenny pretended that she was paranoid and said that her parents would kill her if they found out she was meeting an older man. The defendant responded, "lol. . .i know they would . . . we're not doing anything physical [today I] promise . . . just puffing." He also added, "i don't want to get caught . . . i would be in trouble to." Jenny said that she was scared, and the defendant said, "i understand. . .but you have to know why i'm scared too. . .i could get in more trouble than you . . . i just wanted to start slow so noone would be scared." He also noted that "if you got caught and got in trouble from your parents and they grounded you and you had to tell about me. . .i could get in trouble.

[9] An emoticon, as it is called in Internet vernacular, is a little cartoon face that can be added to the text of an instant message. The faces come in numerous expressions and are used to illustrate how the speaker is feeling or the intended meaning of what he or she has written.

.not too much now cause i never met you." Jenny apologized for not meeting, and they made plans to meet another time.

The following day, February 27, 2007, the defendant contacted Jenny. Jenny asked if the defendant wanted her to call him, and he said that he did but not right then. He said, "i'll be free sunday i'm pretty sure. . .and my roomie will be away . . .so we can wait till then if you want. . .i'll save some." Jenny told the defendant to wait one second and then never responded. The defendant waited for one hour, sent an emoticon with a confused expression, waited an additional half hour and said that he had to go and that Jenny could call him anytime. This last message included a happy face emoticon.

On March 1, 2007, Jenny initiated a conversation with the defendant. The defendant did not respond right away, indicating that he had just smoked marijuana. They had a conversation about school, work and their respective weekend availability. When Jenny said she had no plans, the defendant said, "cool . . . call me or im me."[10]

On March 2, 2007, Jenny initiated a conversation with the defendant, asking if she could give him a call. The defendant was at work and said it would be better if she called later, but shortly thereafter they agreed that Jenny would call him. Officer Felicia Figol, playing the role of Jenny, called the defendant's cellular telephone. Figol testified that during the conversation the defendant talked about how he wanted to meet with Jenny, take her to his house, smoke with her and then "do it" with her. Jenny[11] asked when, and the defendant

---

[10] The abbreviation "im" stands for "instant message."

[11] For clarity, as we have done in regard to the Internet chats conducted by Frank, we will refer to statements made by Figol, while posing as Jenny, as having been spoken by that name.

suggested they meet the following day, March 3, 2007, at noon at the Grand Union in Newtown. Jenny told the defendant that she would have to make sure her parents were not around and then got off the telephone shortly after. After the telephone call, the defendant reinitiated the Internet conversation. He said, "can't wait till tomorrow." They talked for a short time and discussed possibly chatting later that night before Jenny went out.

On March 3, 2007, the defendant used "Google Earth," an Internet mapping program that allows users to look up addresses. He searched various addresses on the street in Newtown where Jenny had told him that she lived. Jenny did not show up for their arranged meeting.[12]

On Monday, March 5, 2007, Jenny initiated a conversation with the defendant and apologized for not meeting him over the weekend, as they had planned. The defendant responded, "what happened?" Jenny, however, did not respond at that time. The next day, Jenny responded, explaining that she had gotten into trouble with her parents and that that was why she did not show up for their meeting. Two hours later, the defendant responded, but Jenny was no longer online. A few hours later, Jenny responded and had a conversation with the defendant in which both parties mentioned that they were not doing anything at the time. The defendant asked if Jenny wanted to "hang out." Jenny said that she did, and the defendant offered to pick her up at her parents' house. He said, "and i have some stuff left."

---

[12] The defendant claims that he did not go to the meeting place and offers as evidence the fact that he had plans to go skiing in Vermont on Sunday, March 4, 2007. It is unclear why he believes this is evidence that he could not have met with Jenny on Saturday. Also, the state presented computer forensic evidence that on March 3, 2007, the defendant used the Internet mapping program, "Google Earth," to look up various addresses on the street in Newtown where Jenny said that she lived.

Jenny suggested that he come to her house, but the defendant replied, "lol. . .i think that's a little crazy. .what if [your parents] come home early or something. . .my car would be there too." The defendant said that his residence was only ten minutes away and that his roommate would not be home. Jenny suggested they meet at the commuter parking lot near exit eleven off Interstate 84, which she said was near her house. Jenny asked what the defendant wanted to do at his house, and he responded, "whatever you want we can do," and included a winking emoticon. Jenny asked, "u hav condoms. . or do u want me to steel some from my dad." The defendant replied, "dont worry about it. . .i have some." Jenny then asked if the defendant remembered her second rule, apparently reminding the defendant that she would not engage in anal sex. The defendant replied, "lol . . . you didn't say that b4 . . . lol." Jenny also joked, "i hope that i can hold myself until we get to ur place. . . who know s what may happen in ur car." The defendant responded, "lol . . . we can make it . . . 10 minutes . . . away." The defendant indicated that he would be driving a blue Honda Civic hatchback.

At the prearranged time, the defendant drove into the commuter lot in his blue hatchback. Frank, who had been waiting in the parking lot, stopped the defendant and asked him if he knew why the police were there. Frank testified that the defendant responded, "[Y]eah. I was really stupid for what [I] did." Frank revealed that he was "xoconnecticutcheerleaderxo," and the defendant admitted that he was "Andrewfsx."

At trial, the defendant admitted to having the conversations on the computer and acknowledged that Jenny told him that she was fifteen years old. He denied, however, actually believing that Jenny was fifteen. He admitted to arranging to meet Jenny on two occasions and to traveling to the commuter parking lot for the

purpose of meeting Jenny. When questioned about his intent to pick up a fifteen year old child and provide her with drugs, the defendant claimed that he just wanted to meet her. The defendant was then pressed about whether he intended to smoke marijuana with Jenny, and he said that it depended "on who she was." When questioned about the March 3 telephone call, the defendant admitted to having told Jenny that he wanted to smoke marijuana with her but denied saying that he wanted to "do it" with her. In regard to the March 6 meeting, the defendant claimed that he did not, in fact, have condoms or marijuana in his home, although he admitted that he had told Jenny that he did.

In raising the defense of entrapment, the defendant emphasized the role that Jenny played in their interaction, noting that she initiated a number of the chats, she asked for his cellular telephone number, she called him, she complimented his body and she sent "alluring" photographs of herself. He also testified that he never had any relationships or interests in girls under the age of sixteen years of age and that he had gone to the romance chat room looking for an adult woman, not a fifteen year old child. The defendant also presented, as an expert witness, forensic psychiatrist Stephen Herman, who testified that he did not conclude that the defendant "is a predator or trolls the Internet looking for children to hook up with." Herman also testified that the defendant told him that he was "aroused" by talking with Jenny and that when he went to meet her, his intentions were, perhaps, to have sex with her. The court properly instructed the jury on the defense of entrapment with respect to all of the charged offenses. The jury found the defendant guilty of all charges, and the defendant now appeals.

I

In order for the jury to have found the defendant guilty, it had to find that the state proved each of the

elements of the respective charges beyond a reasonable doubt and disproved his claim of entrapment beyond a reasonable doubt. If the jury did not find that the state met its burden of proof regarding the elements of the offense, there would be no need to address the defendant's defense of entrapment. Accordingly, we will first address the defendant's insufficiency of the evidence claim relating to the conviction of attempt to commit sexual assault in the second degree.

The defendant claims that the state did not present sufficient evidence on which the jury could have found beyond a reasonable doubt that he was guilty of the crime of attempt to commit sexual assault in the second degree. Specifically, the defendant claims that the state did not prove that he had the requisite intent to commit a sexual assault, nor did it prove that he had taken a substantial step toward committing the sexual assault because the state only presented evidence that he talked on the Internet and went to the prearranged meeting place. We disagree.

The standard of review for a claim of insufficient evidence is well settled. "In reviewing a sufficiency of the evidence claim, we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [trier of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . In evaluating evidence, the trier of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The trier may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . . This does not require that each subordinate conclusion established by or

inferred from the evidence, or even from other inferences, be proved beyond a reasonable doubt . . . because this court has held that a [trier's] factual inferences that support a guilty verdict need only be reasonable. . . .

"[A]s we have often noted, proof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the trier, would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [trier's] verdict of guilty." (Internal quotation marks omitted.) *State* v. *Butler*, 296 Conn. 62, 76–77, 993 A.2d 970 (2010).

For the jury to find the defendant guilty of attempt to commit sexual assault in the second degree, the state had to prove beyond a reasonable doubt that he attempted to engage in sexual intercourse with a person older than thirteen years of age but under sixteen years of age and that the defendant was more than two years older. See General Statutes (Rev. to 2007) § 53a-71 (a) (1); see also footnote 1 of this opinion. "[S]exual assault in the second degree is a general intent crime that requires only that the actor possess a general intent to perform the acts that constitute the elements of the offense. . . . Thus, under § 53a-71 (a) (1), the state is not required to establish that the accused knew that the person with whom he had sexual intercourse was under the age of sixteen; the state must prove only that the accused knowingly engaged in sexual intercourse with a person who, in fact, had not attained the age of sixteen." (Citation omitted; internal quotation marks omitted.) *State* v. *Sorabella*, 277 Conn. 155, 169, 891

A.2d 897, cert. denied, 549 U.S. 821, 127 S. Ct. 131, 166 L. Ed. 2d 36 (2006).

Under § 53a-49 (a), "[a] person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime, he . . . (2) intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime." "Proof of an attempt to commit a specific offense requires proof that the actor intended to bring about the elements of the completed offense. . . . Moreover, to be guilty of attempt, a defendant's conscious objective must be to cause the result which would constitute the substantive crime." (Citation omitted; internal quotation marks omitted.) *State* v. *Sorabella,* supra, 277 Conn. 169–70.

As noted, under § 53a-71 (a) (1), the state is not required to establish that an accused knew that the victim was underage. In circumstances such as this, however, in which the victim was not a real person, the state was required to prove that the defendant believed that Jenny was fifteen years of age because, otherwise, the state could not establish that a crime was committed. As our Supreme Court has explained in a similar situation: "In other words, for purposes of this case, which arises out of an Internet sting operation, because there was no actual person under the age of sixteen with whom the defendant was attempting to have sexual intercourse, the state necessarily had to prove that the defendant believed that there was a person under that age with whom he was going to engage in sexual intercourse. In the absence of such proof, the state would have established only that the defendant was seeking to meet a person of unknown age for the purpose of having sexual intercourse." Id., 171 n.19.

Accordingly, on the charge of attempt to commit sexual assault in the second degree, the state had to prove that the defendant had the intent to engage in sexual intercourse with a person he believed was between the ages of thirteen and sixteen and that he intentionally did something that constituted a substantial step toward doing so. Section 53a-49 (b) provides in relevant part that "[c]onduct shall not be held to constitute a substantial step . . . unless it is strongly corroborative of the actor's criminal purpose. . . ."

Regarding the element of intent, the defendant argues (1) that he did not know that Jenny was only fifteen and (2) that he did not intend to have sexual intercourse with her. As to her age, the defendant points out that Jenny's chat room profile did not list her age, that the photographs Jenny sent to him were of a police officer when she was seventeen years old and that, at one point in their chats, Jenny told him that she was eighteen years old. At trial, however, there was no evidence that the defendant knew the photographs were of a seventeen year old girl at the time that he received them. Also, it is abundantly clear from the transcripts, as well as from Frank's testimony, that when Jenny said that she was eighteen years old she was being facetious and that she said it in response to the defendant's joking request that she "go away . . . change your name . . and say you're 17 lol."

Additionally, the state presented a wealth of evidence contradicting the defendant's claims. The transcripts of the defendant's Internet conversations with Jenny show that she told him during their first conversation that she was fifteen years old. Additionally, Jenny repeatedly made references indicative of her young age. Over the course of her conversations with the defendant, Jenny mentioned her former boarding school, being in the tenth grade at Newtown public high school, snow days, school vacation, her parents not trusting her, getting

into trouble with her parents, sharing a cellular telephone with her mother, not having a job and not having her driver's license, all of which point to Jenny being a young teenager. Also, the defendant's assertion that he did not know that Jenny was fifteen is contrary to many of the defendant's own statements. When Jenny told him that she was fifteen he said, "i wish you were 16 . . that's what you should have said." At one point, he said, "[G]od. . . you're driving me crazy," and Jenny asked why, to which he responded, "cause you're only 15 . . it's your fault . . . jk . . . ." See footnote 8 of this opinion. At another point, he asked Jenny when she was going to become sixteen years old. He mentioned that he wished he lived in "[K]entucky or something" because the laws there were different than in Connecticut, apparently recognizing that it was illegal for him and Jenny to have a sexual relationship in Connecticut due to Jenny's young age. Also, as mentioned earlier, he told Jenny to "go away . . . change your name . . and say you're 17 lol."

Concerning the defendant's intent to engage in sexual intercourse, the defendant claims that he intended only to meet with Jenny, not to engage in sexual intercourse. In support of this assertion, the defendant attempts to negate the plain language of his Internet conversations with Jenny, regarding plans to engage in sexual intercourse, by claiming that it was nothing more than talk. As evidence of such, the defendant refers to a section of the transcript in which he indicated to Jenny that he did not want to "go on cam"[13] at that time but would do so later, when, in fact, his computer was not equipped with a webcam. The defendant also notes that the police did not find any condoms in his possession when he was arrested at the commuter parking lot.

---

[13] A webcam is a device connected to a computer that takes video of whatever the lens is pointed at, much like a video camera, and that video can be streamed over the Internet to other computers, thus, enabling individuals to see each other while they are on their respective computers.

The state, however, presented evidence of the defendant's intent. During their Internet chats, the defendant indicated a desire to have a physical relationship with Jenny. On February 16, 2007, the date of their first conversation, after less than one hour of chatting, the defendant began making references to sexual intercourse. While discussing whether they were going to see each other on webcams, the defendant said, "i need to see you to turn me on . . . ." Later, when Jenny asked the defendant what was on his mind, he responded, "sex and smoking . . . ." He went on to say, "you turn me on too much . . . you make me feel special down there." At one point, the defendant said that he thought Jenny was "a nice little private school girl." Jenny responded, "i bet you wish i still wuz . . . 2 bad i had to giv back my uniform," to which the defendant said, "yeah, that outfit would be hot . . . i'd lift that little skirt up . . . i'd kiss you all over." Jenny then asked, "what is it that u like 2 do." The defendant responded, "make you feel so good."

On February 26, 2007, the defendant and Jenny again talked about getting together to smoke marijuana. The defendant indicated that he would pick Jenny up, that they could just go for a ride and then he would bring her home. Jenny asked, "and u think id be able to control myself . . . u better bring something else just in case . . . ." The defendant responded, "lol. . .we'll see. . . .if i come to pick you up i'll come with nothing and then pick it up quick . . . sorry i don't totally trust you till i meet." Jenny said that the defendant's cautiousness made her nervous and noted that her parents would kill her if they found out she was seeing an older man. The defendant responded, "lol. . .i know they would . . . we're not doing anything physical [today I] promise . . . just puffing."

Figol testified that when she spoke with the defendant on the telephone he indicated that he wanted to

take her to his house and "do it" with her. He suggested that they meet the next day, and they made plans to do so. The following day, Saturday, March 3, 2007, Jenny did not show for the arranged meeting, and it is disputed whether or not the defendant showed. On March 6, 2007, the defendant asked Jenny if she wanted to "hang out." They made plans to go to the defendant's house, and he indicated that his roommate was not going to be there.[14] Jenny asked the defendant what he wanted to do at his house, to which he responded, "whatever you want we can do," and used a winking emoticon. Jenny then asked, "u hav condoms . . or do u want me to steel some from my dad." The defendant responded, "dont worry about it. . .i have some." Next, Jenny asked, "and do u rember my second rule," and provided the answer, "no ass." The defendant responded, "lol . . . you didn't say that b4 . . . lol." Jenny said, "i hope that i can hold myself until we get to ur place. . . who knows what may happen in ur car." The defendant responded, "lol . . . we can make it . . . 10 minutes . . . away . . . ok. . i'll let you get ready." On the basis of the foregoing evidence, we conclude that the state presented sufficient evidence from which the jury reasonably could have found that the defendant went to the commuter lot intending to engage in sexual intercourse with a person whom he believed to be a fifteen year old child.

The defendant next claims that the state failed to prove that he took a substantial step in furtherance of committing the crime of sexual assault in the second degree. He asserts that other than the sexual talk on the Internet and driving to meet Jenny at the commuter lot, there was no evidence of a substantial step. We are not persuaded.

---

[14] At trial, it was revealed that the defendant lived with his parents.

As noted earlier, "[c]onduct shall not be held to constitute a substantial step . . . unless it is strongly corroborative of the actor's criminal purpose. Legally sufficient examples of strongly corroborative conduct include enticing or seeking to entice the contemplated victim of the crime to go to the place contemplated for its commission . . . and the possession of materials to be employed in the commission of the crime, which are specially designed for such unlawful use or which can serve no lawful purpose of the actor under the circumstances. . . . What constitutes a substantial step in any given case is a question of fact. . . . In general terms, however, [a] substantial step must be something more than mere preparation, yet may be less than the last act necessary before the actual commission of the substantive crime, and thus the finder of fact may give weight to that which has already been done as well as that which remains to be accomplished before commission of the substantive crime." (Citations omitted; internal quotation marks omitted.) *State* v. *Sorabella*, supra, 277 Conn. 180.

In *Sorabella*, just as in this case, the police used a computer sting operation to arrest and to convict a defendant of attempt to commit sexual assault in the second degree. In that case, the defendant claimed that the state had failed to prove that he took a substantial step toward committing sexual assault in the second degree. Id., 178. Our Supreme Court found that "the conduct of a suspect who, for the purpose ultimately of having sex with a person whom the suspect believes to be a child, travels to a prearranged location to meet that child, is sufficient to constitute a substantial step in furtherance of the planned sex crime."[15] Id., 182.

---

[15] The defendant correctly notes that the facts of this case are not entirely analogous to those in *Sorabella*. First, the chat room in which the defendant in *Sorabella* arranged the illicit meeting was titled "I Love Much Older Men"; *State* v. *Sorabella*, supra, 277 Conn. 163; which is different from the more general "Romance" chat room in this case. Second, when the defendant in *Sorabella* showed up for the rendezvous, he had pornographic videos in his

Here, the state presented evidence that the defendant engaged in conversations such that the jury reasonably could have found that he intended to engage in sexual intercourse with Jenny and that he then drove to their prearranged meeting place for that illicit purpose. Although the defendant considers it significant that the police did not find any condoms or marijuana in his possession when he was arrested in the commuter parking lot, the jury was free to weigh this evidence within the context of all of the other evidence, including the fact that the plan was for the defendant to pick up Jenny and to take her back to his house.

In accordance with *Sorabella*, we find that the defendant's actions constituted a substantial step toward the commission of the crime of sexual assault in the second degree. We conclude that the jury reasonably could have found that the cumulative force of the evidence established that the defendant was guilty beyond a reasonable doubt. Accordingly, the defendant's claim of insufficiency of the evidence relating to his conviction of sexual assault in the second degree must fail.

## II

The defendant next claims that the state failed to present sufficient evidence to disprove his entrapment defense. Specifically, the defendant claims that the state did not present any evidence that he was predisposed to commit the charged crimes prior to his being induced to do so by the police. We are not persuaded.

As a threshold matter, we again set forth the two-pronged standard of review for claims of insufficiency

possession, which he intended to show to the minor child; id., 179; whereas in this case, the defendant did not have any incriminating evidence in his possession. The *Sorabella* court's language is clear, however, that it did not base its decision on these facts; rather, it held that when the intent is to engage in sexual assault with a minor, merely going to a prearranged location is a substantial step.

of the evidence. "First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [trier of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Butler*, supra, 296 Conn. 76–77.

General Statutes § 53a-15, our entrapment statute, provides: "In any prosecution for an offense, it shall be a defense that the defendant engaged in the proscribed conduct because he was induced to do so by a public servant, or by a person acting in cooperation with a public servant, for the purpose of institution of criminal prosecution against the defendant, and that the defendant did not contemplate and would not otherwise have engaged in such conduct." Our Supreme Court has held that the test for entrapment is a subjective test that "focuses on the disposition of the defendant to commit the crime of which he or she is accused."[16] *State* v. *Lee*, 229 Conn. 60, 78, 640 A.2d 553 (1994). "It is well settled that the fact that officers or employees of the Government merely afford opportunities or facilities for the commission of the offense does not defeat the prosecution. Artifice and stratagem may be employed to catch those engaged in criminal enterprises. . . . In their zeal to enforce the law, however, Government agents may not originate a criminal design, implant in an innocent person's mind the disposition to commit a criminal act, and then induce commission of the crime so that the

---

[16] In *Lee*, the court rejected the opportunity to adopt an objective standard, as certain other states have done. Under the objective standard, "entrapment exists if the government conduct was such that a reasonable person would have been induced to commit the crime. This standard necessarily focuses attention on the conduct of the government. . . . Under an objective standard, the disposition of the accused to commit the crime is irrelevant." (Citations omitted.) *State* v. *Lee*, supra, 229 Conn. 80.

Government may prosecute." (Citations omitted; internal quotation marks omitted.) *Jacobson* v. *United States*, 503 U.S. 540, 548, 112 S. Ct. 1535, 118 L. Ed. 2d 174 (1992). "Thus, the subjective defense of entrapment succeeds only if the government, not the accused, is the source of the criminal design. The subjective defense fails if the accused is previously disposed to commit the crime, and the government merely facilitates or assists in the criminal scheme." *State* v. *Lee*, supra, 79.

"As the subjective entrapment doctrine has been applied in Connecticut, the defendant has the initial responsibility to present sufficient evidence that the state induced him or her to commit the offense charged . . . . Once that burden has been met, however, the burden shifts to the state to prove beyond a reasonable doubt that the defendant was predisposed to commit the offense." (Citation omitted.) Id., 82. "[T]he defense of entrapment raises a question of fact, and, where there is a claim of entrapment, the issue must be resolved by the trier . . . ."[17] (Citation omitted; internal quotation marks omitted.) *One Way Fare* v. *Dept. of Consumer Protection*, 96 Conn. App. 780, 783, 901 A.2d 1246 (2006).

---

[17] While the defendant primarily argues a question of fact, whether or not the state presented sufficient evidence to disprove his entrapment defense beyond a reasonable doubt, he also asserts that he should prevail as a matter of law. The defendant cites *State* v. *Jurgensen*, 42 Conn. App. 751, 681 A.2d 981, cert. denied, 239 Conn. 931, 683 A.2d 398 (1996), in which this court noted: "It is inappropriate for an appellate court to determine whether a defendant was entrapped when such a determination would necessarily entail choosing between conflicting witnesses and judging credibility. . . . Furthermore, a defendant may prevail on a claim of entrapment as a matter of law only when it is undisputed, based on the evidence viewed in the light most favorable to the state, that the defendant was induced by the state to commit the crimes and was not predisposed to do so." (Citations omitted; internal quotation marks omitted.) Id., 761. The defendant claims, without elaboration, that because the evidence in this case is "mostly undisputed," he should prevail as a matter of law. We do not agree that the evidence in this case is undisputed, and, therefore, the defendant cannot prevail on the basis of the reasoning of *Jurgensen*.

In regard to the inducement prong of the entrapment defense, federal courts have held that a simple request or suggestion to commit a crime amounts to inducement under the law. Connecticut's appellate courts, however, have stated that that is not the law in this state. More than a simple request is required. Id., 784. "Under our state decisional law, '[e]vidence of unlawful inducement may be found where the police . . . appeal to the [accused's] sympathy or friendship, or where they repeatedly or persistently solicit the [accused] to commit the crimes.' " Id. In this case, the court found that the defendant had provided sufficient evidence of inducement to warrant giving a jury instruction on entrapment. Thus, we need not decide whether the defendant met his burden of establishing inducement. We find, however, that the state presented sufficient evidence from which the jury reasonably could have found that the state met its burden of proving beyond a reasonable doubt that the defendant was predisposed to commit the crimes of which he was convicted.

In order for the state to prove that a defendant was predisposed to commit the charged offenses, it must show that the criminal intent or the willing disposition to commit the crimes originated with the defendant, not with the government. See *State* v. *Lee*, supra, 229 Conn. 60. "A predisposition to commit the crime, which is triggered by circumstances created by, or under the control of, the police, does not set the stage for the defense of entrapment." *State* v. *Taylor*, 153 Conn. 72, 84, 214 A.2d 362 (1965), cert. denied, 384 U.S. 921, 86 S. Ct. 1372, 16 L. Ed. 2d 442 (1966). Predisposition may be shown, among other ways, by establishing proof of a "willingness to commit the crime for which he is charged as evidenced by the accused's ready response to the inducement." (Internal quotation marks omitted.) *United States* v. *Brand*, 467 F.3d 179, 191 (2d Cir. 2006),

cert. denied, 550 U.S. 926, 127 S. Ct. 2150, 167 L. Ed. 2d 878 (2007).

The leading United States Supreme Court case regarding entrapment, *Jacobson* v. *United States*, supra, 503 U.S. 540, guides our analysis regarding proof of predisposition. In *Jacobson*, the court noted that "the prosecution must prove beyond reasonable doubt that the defendant was disposed to commit the criminal act prior to first being approached by Government agents. . . . Thus, an agent deployed to stop the traffic in illegal drugs may offer the opportunity to buy or sell drugs and, if the offer is accepted, make an arrest on the spot or later. In such a typical case, or in a more elaborate sting operation involving government-sponsored fencing where the defendant is simply provided with the opportunity to commit a crime, the entrapment defense is of little use, because the ready commission of the criminal act amply demonstrates the defendant's predisposition. . . . Had [the defendant] promptly availed himself of this criminal opportunity, it is unlikely that his entrapment defense would have warranted a jury instruction." (Citations omitted; internal quotation marks omitted.) Id., 549–50. The court found that the defendant in that case had not promptly availed himself of the opportunity to purchase child pornography that was offered by government agents. "By the time [the defendant] finally placed his order [for child pornography], he had already been the target of *26 months of repeated mailings* and communications from Government agents and fictitious organizations. Therefore, although he had become predisposed to break the law by May, 1987, it is our view that the Government did not prove that this predisposition was independent, and not the product of the attention that the Government had directed at petitioner since January 1985." (Emphasis added.) Id., 550. The court found that the government "overstepped the line between setting a trap for the

'unwary innocent' and the 'unwary criminal,' . . . and, as a matter of law failed to establish that [the defendant] was independently predisposed to commit the crime for which he was arrested . . . ."[18] (Citation omitted.) Id., 542.

Pursuant to the reasoning of *Jacobson*, we must determine in the case at hand whether the state presented sufficient evidence from which the jury reasonably could have found that the defendant was predisposed to commit the crimes of which he was convicted prior to his contact with the police or if his disposition to do so was the product of the police conduct. The defendant claims that he was not disposed to commit the crimes prior to being manipulated by persistent police efforts. Conversely, the state argues that although it may have used tactics aimed at breaking down the defendant's defenses, the criminal intent originated with the defendant and he readily availed himself of the criminal opportunity created by the police. We agree with the state.

The state makes no claim that it had reason to suspect the defendant of criminal activity when Frank first entered the Internet chat room as xoconnecticutcheerleaderxo. This was not a targeted investigation in which the state was specifically investigating the defendant due to a tip, or otherwise, with the goal of making an arrest and seeking prosecution. Accordingly, at trial, the state did not offer any evidence of predisposition gathered prior to its initial conversation with the defendant. Thus, any evidence of predisposition was based on the defendant's behavior after he made contact with Jenny.

---

[18] There, the court was referring to a previous opinion of the Supreme Court that noted that, when deciding "whether entrapment has been established, a line must be drawn between the trap for the *unwary innocent* and the trap for the *unwary criminal*." (Emphasis added.) *Sherman* v. *United States*, 356 U.S. 369, 372, 78 S. Ct. 819, 2 L. Ed. 2d 848 (1958).

As evidence of predisposition, the state first offers the fact that the defendant initiated contact with Jenny. Frank testified that he chose the name "cheerleader" because he wanted it to be clear to any sexual predators that his screen name was that of a female and he thought that having "cheerleader" in the screen name would be an attraction to sexual predators. The personal profile that corresponded with Jenny's screen name did not include Jenny's age or any other identifying information; thus, the defendant could not have known Jenny's age when he first initiated contact with her. Cheerleading, however, is commonly associated with being an after school activity for female high school students. Certainly, there are college and professional cheerleaders, but the jury was free to draw any reasonable inference from the fact that the defendant contacted an individual with that screen name.[19]

Shortly after the defendant initiated contact with Jenny, she told him that she was fifteen years old and added, "hope thats ok." The defendant responded, "that's not ok, lol.i could go to jail." The defendant's statement, "i could go to jail," illustrates that the defendant was aware of legal ramifications if he were to pursue a sexual encounter with a minor child. However, the defendant's response, in learning that Jenny was only fifteen, was not an unambiguous refusal. By including the "lol," it is unclear whether he was joking that her age was a problem for him or if he was serious. The defendant could have ended the conversation right at that moment, but he did not. Jenny tried to assuage

---

[19] The state notes that almost immediately after initiating the first conversation with Jenny, the defendant sent a photograph of himself in which he was not wearing a shirt. This was apparently done with the hope that "xoconnecticutcheerleaderxo" would find him physically attractive. This fact may be indicative of a desire to engage in a physical relationship, but it does not necessarily show predisposition. There is no evidence that at the time the defendant sent the photograph of himself he had knowledge that Jenny was only fifteen years old.

the defendant's concerns of going to jail by saying that she would not tell anyone. The defendant responded, "there are cops in here all the time pretending to be girls." Jenny said, "so ur saying im a pig," to which the defendant responded, "i just don't want to go to jail . . . i wish you were 16. . that's what you should have said." Jenny wrote, "well. . . i guesss it ur decision. . . nice 2 meet u." Then, in response to the defendant's comment that she should have said she was sixteen, she said, "and lye 2 u." The defendant responded, "yep lol. . .prove you're not a cop." This section of the conversation clearly shows that the defendant feared getting into trouble for having an illegal sexual relationship with Jenny. It does not show a lack of desire to have a relationship with a minor. In fact, taking the evidence in the light most favorable to the state, as we must, it is reasonable to interpret the defendant's comments to mean that he would like to have a sexual relationship with Jenny if only he could be sure that she was not an undercover police officer.

After determining that there was no way for Jenny to prove that she was not a police officer, the conversation continued unabated. Jenny asked the defendant if he had any more photographs, to which he responded, "i have some more pics and a cam." Jenny said that her parents had taken her camera away. The defendant replied, "damn . . . i need to see you to turn me on. .lol . . . ." Thus, less than twelve minutes after learning that Jenny was only fifteen years old, the defendant initiated sexually suggestive talk, unprompted by anything that Jenny had said.

The defendant next mentioned that he did not want to go on camera because he had marijuana he wanted to smoke first. Jenny said she would like to smoke it with him, to which he said, "i'd love to smoke it with you but i've seen to many episodes of dateline . . . the show where they show all the guys picking up girls on

the internet." Again, this shows the defendant's wariness about getting into trouble, but he made no effort to end the conversation. Later in the conversation, after hearing that Jenny was in the tenth grade at Newtown public high school and again talking about smoking marijuana, the defendant said, "i'd have so much fun with you." Jenny responded likewise, and the defendant replied, "[G]od, you're driving me crazy," explaining that to be the case because she was "only 15. . it's your fault . . . jk hehe." See footnote 8 of this opinion. The defendant then said, "go away . . change your name . . and say you're 17 lol." These comments, again, can reasonably be seen as evidence that the defendant was wary of getting into trouble but interested in having a relationship with a fifteen year old child.

Shortly thereafter, there was a break in the conversation when Jenny's mother was supposedly calling her and she had to go walk her dog. When they resumed their conversation, Jenny asked the defendant what was on his mind, to which he responded, "sex and smoking is on my mind." Again, it was the defendant who initiated the topic of sex. Jenny played along, saying, "sounds all good 2 me." The defendant then said, "you turn me on too much . . . you make me feel special down there." There was some sexually suggestive banter back and forth, and then mention was made of Jenny's private school uniform. The defendant said, "i'd lift that little skirt up . . . i'd kiss you all over . . . make you feel so good . . . do you have a license." Jenny said that she was taking driver's education classes and said, "dont u think if i had a license id be looking for ya." He then replied, "lol. . .i wish i lived in [K]entucky or something. . .i'd pick you up in 2 seconds." This section of transcript shows clearly that the defendant was attracted to the idea of having a sexual relationship with Jenny, a fifteen year old child. Also, from the rather abrupt jump from talking about pleasing

Jenny sexually to asking if she had her license, it could be inferred that the defendant was thinking about meeting Jenny in person. This was the first mention of the two parties actually meeting, and it reasonably could be inferred that the thought originated with the defendant, not with the police.

Later, the defendant said that he had to go and started to say goodbye. He told Jenny that he would like to talk to her again, that he would love to see her, would love to go on camera for her but that she needed to be on camera at the same time, and he said that he would love to smoke marijuana with her. Jenny responded that she could come meet him, and he said that he wanted her to. The defendant's ready response could reasonably be seen by the jury as evidence of a willing disposition. Jenny then backed out of the meeting because of her parents and tried to say goodbye, but the defendant persisted and asked, "what are you wearing." She said that she was wearing a pair of sweatpants and a T-shirt, to which he responded, "that's hot." Shortly thereafter, they ended the conversation and agreed that they would talk again, with the defendant mentioning that he hoped to see her without there being fingerprints in the way, which was a reference to the smudged photographs that Jenny showed him of herself. This later conversation affirms the fact that the defendant was interested in maintaining and advancing a relationship with a fifteen year old child.

All of the preceding conversation took place during the first interaction between the defendant and Jenny. Upon reviewing the transcript, the jury reasonably could have found that the defendant was not the "unwary innocent"; (internal quotation marks omitted) *Jacobson* v. *United States*, supra, 503 U.S. 542; that the entrapment defense is designed to protect. In fact, the record amply demonstrates that the defendant was clearly quite wary of getting himself into trouble. The

defendant's initial wariness, however, did not stop him from initiating sexual talk with a girl whom he believed to be fifteen, alluding to sexual contact that he wanted to engage in with her, agreeing to meet her to smoke marijuana, making plans to talk again and, perhaps, to see each other in person. From the first minutes of his chat with Jenny, the defendant made clear that he knew that he should not, and legally could not, engage in sexual activity with Jenny, but, at no point did he ever say that he would not. The defendant could have ended the correspondence at any time, but he did not do so.

On the basis of the defendant's seeking out xoconnecticutcheerleaderxo, his ambiguous reaction to learning that Jenny was only fifteen years old, his initiation of sexually charged comments less than twelve minutes after learning Jenny's age, his continuing sexually oriented comments throughout the conversation and his ready willingness to meet Jenny to smoke marijuana after chatting with her for less than one hour, the jury reasonably could have found that the defendant was predisposed to engage in the charged conduct independent of the police conduct, rather than it being "the product of the attention"; id., 550; that the police directed at him between February 16 and March 6, 2007.[20] Frank may have pulled all the right strings so that later in their communications the defendant felt comfortable that he could rendezvous with Jenny without getting caught by the police, but Frank did not implant in the defendant's mind the desire to have sexual contact with a fifteen year old girl, a desire the defendant made clear that he had within minutes of initiating a conversation with Jenny. On these grounds,

[20] This roughly seventeen day period was a far cry from the twenty-six months of repeated mailings and communications that caused the United States Supreme Court to find in *Jacobson* that the defendant's disposition to commit the charged offense was the product of the persistent government attention.

we conclude that the state presented sufficient evidence for the jury to have reasonably found that the defendant was predisposed to commit the charged crimes prior to any inducement by the police. Accordingly, we conclude that the state presented sufficient evidence for the jury to have found beyond a reasonable doubt that the state had disproved the defendant's entrapment defense.

## III

The defendant next claims that the court improperly denied his motion for a judgment of acquittal. He argues that the jury's verdict was incorrect as a matter of law, and, pursuant to Practice Book § 42-51, the court should have ordered a judgment of acquittal on all of the charges.[21] We disagree.

"The standard of appellate review of a denial of a motion for a judgment of acquittal has been settled by judicial decision. . . . The issue to be determined is whether the jury [reasonably could have] concluded, from the facts established and the reasonable inferences which could be drawn from those facts, that the cumulative effect was to establish guilt beyond a reasonable doubt. . . . The facts and the reasonable inferences stemming from the facts must be given a construction most favorable to sustaining the jury's verdict. . . . It is established case law that when a defendant challenges the sufficiency of the evidence, we apply a twofold test. We first review the evidence . . . in the light most favorable to sustaining the jury's verdict. We then determine whether, upon the facts thus established and the inferences reasonably drawn . . .

---

[21] Practice Book § 42-51 provides in relevant part: "If the jury returns a verdict of guilty, the judicial authority, upon motion of the defendant or upon its own motion, shall order the entry of a judgment of acquittal as to any offense specified in the verdict, or any lesser included offense, for which the evidence does not reasonably permit a finding of guilty beyond a reasonable doubt. . . ."

the jury [reasonably could] have concluded that the cumulative effect of the evidence established guilt beyond a reasonable doubt . . . . In this process of review, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct." (Internal quotation marks omitted.) *State* v. *Mungroo*, 111 Conn. App. 676, 689–90, 962 A.2d 797 (2008), cert. granted on other grounds, 291 Conn. 907, 969 A.2d 172 (2009). Accordingly, we address in turn the sufficiency of the evidence as it relates to each of the four offenses of which the defendant was convicted.

The first offense of which the defendant was convicted was attempt to commit sexual assault in the second degree. As we discussed in relation to the defendant's first claim, the state presented sufficient evidence from which the jury reasonably could have found the defendant guilty beyond a reasonable doubt of this charge. As this claim involves the same factual and legal basis on which we reviewed the defendant's sufficiency of the evidence claim, we need not belabor the issue by repeating our analysis. The court did not improperly deny the defendant's motion for a judgment of acquittal as to the conviction of attempt to commit sexual assault in the second degree.

We next turn to the defendant's conviction of two counts of attempt to commit risk of injury to a child. The first count was related to the charge of attempt to commit sexual assault in the second degree. The second count was related to the sexually oriented Internet chats and the plan to meet Jenny for the purpose of smoking marijuana and engaging in sexual activity. We address each count in turn.

The first count of attempt to commit risk of injury to a child was in violation of §§ 53a-49 and 53-21 (a) (2). In order to prevail on this charge, the state had to

show that the defendant attempted to have "contact with the intimate parts . . . of a child under the age of sixteen years or [that he] subject[ed] a child under sixteen years of age to contact with the intimate parts of such person, in a sexual or indecent manner likely to impair the health or morals of such child . . . ." General Statutes § 53-21 (a). The factual basis on which we have found sufficient evidence for the jury to find the defendant guilty of attempt to commit sexual assault in the second degree is equally applicable to this charge. By attempting to engage in sexual intercourse with a fifteen year old child, the defendant necessarily attempted to have "contact with the intimate parts . . . of a child under the age of sixteen . . . ." General Statutes § 53-21 (a). Accordingly, the court properly denied the defendant's motion for a judgment of acquittal as it related to this charge.

The defendant was convicted of the second count of attempt to commit risk of injury to a child in violation of §§ 53a-49 and 53-21 (a) (1), which is often referred to as the "situation prong" of the risk of injury statute. Section 53-21 (a) (1) is violated when a person "wilfully and unlawfully causes or permits any child under the age of sixteen years to be placed in such a situation that the life or limb of such child is endangered, the health of such child is likely to be injured or the morals of such child are likely to be impaired, or does any act likely to impair the health or morals of any such child . . . ." At trial, the state charged that the defendant violated this statute by "having a number of sexually oriented computer instant messages with an individual he believed to be a [fifteen] year old child and prearranged through a computer chat room a time and location to meet and smoke marijuana and engage in sexual activity with an individual he believed to be a [fifteen] year old child . . . ."

"To establish the crime of attempt to commit risk of injury to a child under the situation prong of § 53-21 (a) (1), the state must prove that the defendant took a substantial step wilfully or unlawfully to cause or permit a child younger than age sixteen to be placed in a situation in which the life or limb of the child was endangered, the health of the child was likely to be injured or the morals of the child were likely to be impaired. . . . In general terms, [a] substantial step must be something more than mere preparation, yet may be less than the last act necessary before the actual commission of the substantive crime, and thus the finder of fact may give weight to that which has already been done as well as that which remains to be accomplished before commission of the substantive crime. . . . In order for behavior to be punishable as an attempt, it need not be incompatible with innocence, yet it must be necessary to the consummation of the crime and be of such a nature that a reasonable observer, viewing it in context could conclude beyond a reasonable doubt that it was undertaken in accordance with a design to violate the statute." (Citation omitted; internal quotation marks omitted.) *State* v. *Aziegbemi*, 111 Conn. App. 259, 265–66, 959 A.2d 1, cert. denied, 290 Conn. 901, 962 A.2d 128 (2008).

The transcripts of the computer chats that were introduced at trial make clear that the defendant made numerous sexually oriented comments to Jenny, whom he believed to be fifteen years old. We need not repeat these comments, but suffice it to say that they related to the defendant's sexual arousal and the prospect of his having sexual contact with Jenny. The jury reasonably could have found that these comments, coupled with the defendant's statement over the telephone that he wanted to "do it" with Jenny, by themselves, were an attempt to create a situation likely to impair the morals

of a child. By engaging in explicit and provocative sexual talk with a person whom he believed to be a fifteen year old child, the defendant took a substantial step toward committing the crime of risk of injury to a child.

Additionally, during their Internet chats, the defendant engaged Jenny in frequent discussion regarding smoking marijuana, informing her of certain alleged benefits gained from smoking marijuana, offered to provide marijuana to Jenny and, on multiple occasions, discussed arrangements to meet her for the purpose of smoking marijuana together. On March 6, 2007, the defendant discussed getting together with Jenny for the purpose of smoking marijuana and engaging in sexual intercourse. The plan, which was arranged over the Internet, was for Jenny to walk to the commuter parking lot near to her home, where the defendant would meet her and take her to his house. The defendant's own expert testified that the defendant indicated that when he went to the commuter parking lot to meet Jenny, he had the intention of smoking marijuana with her and maybe to have sexual intercourse with her. Based on all the evidence adduced at trial, the jury reasonably could have found that by sending messages about, making a plan to engage in and, then, going to the prearranged meeting place for the purpose of smoking marijuana and engaging in sexual activity, the defendant created a situation that was reasonably likely to impair the morals of a child. Likewise, on the basis of the Internet conversation and the defendant's action of going to the prearranged meeting place, the defendant took a substantial step toward committing the offense of risk of injury to a child.[22] Accordingly, we conclude

---

[22] The defendant asserts that, because no marijuana was found, the state failed to show that the defendant took a substantial step toward impairing the morals of a child by exposing her to marijuana. It is true that the police did not find any marijuana when they arrested the defendant; however, the chat records show that the plan was for the defendant to pick Jenny up and take her to his house. Additionally, the defendant's previous discussions about meeting Jenny for the purpose of smoking marijuana reveal his inten-

that the court properly denied the defendant's motion for a judgment of acquittal as to this charge.

Finally, we address the defendant's conviction of attempt to entice a minor by computer to engage in sexual activity in violation of §§ 53a-49 and 53a-90a. In order to prove the defendant guilty beyond a reasonable doubt, the state had to establish that he attempted to use "an interactive computer service to knowingly persuade, induce, entice or coerce any person under sixteen years of age to engage in prostitution or sexual activity for which the actor may be charged with a criminal offense. . . ." General Statutes § 53a-90a (a). Additionally, in accordance with the attempt statute, the state had to prove that the defendant had the requisite state of mind to commit the crime of enticing a minor by computer and that he took a substantial step toward committing the crime. See General Statutes § 53a-49.

The transcripts of the chat room conversations between the defendant and Jenny clearly establish that the defendant used an " 'interactive computer service.' " General Statutes § 53a-90a (a). As we discussed at length in relation to the defendant's first claim, there was substantial evidence presented to the jury that the defendant believed that he was corresponding with a fifteen year old child. The transcripts reveal that during their initial conversation, after learning that Jenny was only fifteen, the defendant initiated sexually suggestive talk by saying that he needed to see Jenny in order to "turn [him] on." Shortly thereafter, the defendant made increasingly aggressive sexual comments, saying, "you

tion not to bring any marijuana with him when he went to pick up Jenny. He explicitly stated that he would pick up Jenny with "nothing" and once he met Jenny and saw that she was who she said she was, then they would go to his house to pick up the marijuana. Thus, it would be entirely reasonable for the jury not to give much weight to the fact that the defendant did not have any marijuana in his possession.

turn me on too much," and, "you make me feel special down there." He also made comments about lifting up Jenny's skirt, kissing her "all over" and "mak[ing her] feel so good." The jury reasonably could have found that the defendant was attempting to entice Jenny to have a sexual relationship with him. Additionally, the jury could have found that the defendant subsequently verified his intent over the telephone when he told Figol that he wanted to take Jenny to his house and "do it" with her. On two occasions the defendant made plans via the computer to meet Jenny for the purpose of smoking marijuana and engaging in sexual activity. We conclude that the state presented sufficient evidence from which the jury reasonably could have found the defendant guilty beyond a reasonable doubt of attempt to entice a minor by computer to engage in sexual activity. Accordingly, the court properly denied the defendant's motion for a judgment of acquittal as to this charge.

The judgment is affirmed.

In this opinion the other judges concurred.