## STATE OF CONNECTICUT *v.* KURTIS TURNER
## (AC 33013)

Alvord, Espinosa and Bishop, Js.

Argued October 18, 2011—officially released February 28, 2012

*Deborah G. Stevenson*, special public defender, for the appellant (defendant).

*Stephen M. Carney*, senior assistant state's attorney, with whom, on the brief, were *Michael L. Regan*, state's attorney, and *John P. Gravalec-Pannone*, senior assistant state's attorney, for the appellee (state).

*Opinion*

ESPINOSA, J. The defendant, Kurtis Turner, appeals from the judgment of conviction, following a jury trial, of murder in violation of General Statutes § 53a-54a (a). The defendant claims that the trial court improperly (1) refused to appoint a public defender of his choice to represent him, in abuse of its discretion and in violation of his state and federal constitutional rights to a fair trial and to equal protection of the laws, and (2) denied his motion for a judgment of acquittal when the evidence was insufficient to convict him of murder. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. In June, 2007, the defendant was living in an apartment in New London with Curtis McGill. McGill had, on several occasions, sold the drug PCP to Lakisha Alexander, the sister of Vernall Marshall, the victim. At some point during or near in time to April, 2007, Alexander stole some PCP from McGill's apartment. McGill later discovered that she had done so and told her that she owed him a favor.

On June 19, 2007, Alexander, the victim, and two of the victim's friends encountered McGill, who was alone, on Bank Street in New London. The victim approached McGill, and the two of them conversed apart from the others. During the conversation, the victim told McGill that he would not let McGill disrespect his sister. After talking with McGill for two to five minutes, the victim walked back to Alexander and the others. McGill

appeared to be upset, remarking several times that he felt threatened.

Subsequent to this encounter with the victim, McGill made a telephone call, and, three to five minutes later, a car came down Bank Street and parked next to McGill. Three individuals got out of the car, one of whom was the defendant, who was holding a gun. The defendant waved the gun in the air and pointed it at the victim, proclaiming, "I'll do anybody out here," "You want to die?" and, "somebody is going to die." After approximately one minute, McGill told the defendant to stop, and the defendant lowered the gun and returned to the car with the other two individuals. The three of them left in the car, and McGill walked away from the victim, Alexander and the others. On the way back to the apartment, the defendant repeatedly remarked that "[w]ithin forty-eight hours somebody is going to die."

On the night of June 20, 2007, the victim was in New London having drinks with friends. He had gone into New London with his friend, Shannon Johnson, and later that evening he met up with Alexander. In the early morning hours of June 21, 2007, the victim again met up with Johnson on the sidewalk just outside the front entrance to Ernie's Café on Bank Street. At this time, the defendant approached the victim and shot him in the head. Emergency personnel took the victim by ambulance to a nearby hospital, where, after approximately twelve minutes of medical care, he was pronounced dead.

On January 8, 2008, the state filed an information charging the defendant with murder in violation of § 53a-54a (a). On May 28, 2008, attorney Raul Davila was appointed as a special public defender to represent the defendant, which he did for approximately one year without complaint. Beginning on the first day of jury selection on May 28, 2009, the defendant made several

requests that the court remove Davila as his counsel and either appoint new counsel or allow him to represent himself. The court denied the defendant's requests to have new counsel appointed, noting that the requests were made on the eve of trial. The trial then proceeded with Davila representing the defendant. After the defendant entered a plea of not guilty and elected to be tried by a jury, jury selection began.

On July 16, 2009, at the conclusion of the state's case-in-chief, the defendant made an oral motion for a judgment of acquittal, asserting that the evidence was insufficient to establish guilt beyond a reasonable doubt, which the court denied. The jury returned a verdict of guilty, and the defendant was sentenced to sixty years incarceration. The defendant, represented by a different special public defender, filed the present appeal on December 1, 2009. Additional facts will be set forth as necessary.

I

The defendant claims that the court improperly refused to remove attorney Davila and appoint new counsel, a public defender of his choice. The defendant challenges the actions of the court in this regard on several grounds. First, the defendant argues that the court abused its discretion in refusing to remove his counsel and appoint new counsel. Second, the defendant contends that the court failed to canvass him properly regarding his right to represent himself in violation of his due process right to a fair trial under the sixth amendment to the United States constitution. Third, the defendant alleges that the court improperly denied him counsel of choice in violation of his federal constitutional rights to counsel of his choice. Finally, the defendant claims that the court's refusal to appoint counsel of his choice violated his state and federal

constitutional rights to equal protection of the laws. We address each claim in turn.

A

The defendant first claims that the court abused its discretion in refusing to remove his counsel and appoint new counsel.[1] According to the defendant, he demonstrated good cause for the removal of counsel, but the court erroneously ignored his concerns and inappropriately attempted to persuade him as to Davila's ability as a defense attorney. We disagree.

The following additional facts are relevant. By handwritten letter to the court clerk, filed on May 28, 2009, the defendant notified the court that he had discharged Davila and was entering an appearance on his own behalf. In an accompanying "motion to dismiss special public defender and appoint attorney," the defendant moved the court to remove Davila as his counsel and to appoint new counsel. The defendant stated as grounds for his motion that Davila had failed to communicate effectively with him and that their relationship had become "harmful and adversarial . . . ."

[1] The defendant argues that this claim is preserved and that we may, therefore, consider its merits. He maintains that he notified the court that he wanted to have new counsel appointed for him and that the court heard argument on the merits of this request before issuing an oral decision. In the alternative, if the claim is not preserved, the defendant asserts that the claim is entitled to review under *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989). The state disagrees, contending that "the defendant failed to preserve his claim of a violation of his right to self-representation and/or dismissal of counsel under the third prong of *State* v. *Golding*, [supra, 239–40]." (Citations omitted.) This argument erroneously conflates the question of whether the defendant preserved the claim at trial with the question of whether such a claim, if unpreserved, nevertheless is meritorious under *Golding*. If the defendant preserved the claim at trial, we need not undertake a *Golding* analysis. In this case, we conclude that the defendant did preserve his claim at trial. The defendant made two separate motions requesting the removal of Davila and the appointment of new counsel. He argued both of these motions before the court, and the court noted on the record his objection to its subsequent denial of these motions. Therefore, the claim is preserved, and a *Golding* analysis is unnecessary.

On May 28, 2009, the first day of jury selection, the court considered the defendant's motion and accompanying letter. First, the defendant informed the court that he did not intend to represent himself, despite requesting in his May 28, 2009 letter that his appearance be entered by the court clerk. When the court asked the defendant to explain why he believed that he needed a new attorney, he indicated that he did not feel prepared for the upcoming jury selection, stating, "I don't feel safe with my life in [Davila's] hands." The court then advised the defendant of the benefits of being represented by an attorney and cautioned him regarding the risks of self-representation.

The defendant refused to withdraw his motion, stating that, "before we even got to this trial, you know, I had a little miscommunicational problems . . . I have a feeling inside, Your Honor. I just don't feel safe with him, Your Honor." The court denied his request for a new attorney, explaining that it was not satisfied with the reasons offered by the defendant, considering that jury selection was to begin that day. The court told the defendant that he had two options remaining: continue being represented by Davila or represent himself. After he indicated that he did not want to represent himself, the court ordered that Davila continue to represent the defendant.

After its ruling, the court allowed Davila to be heard on the record. Davila maintained that he had visited the defendant in prison on at least three occasions to discuss his case and that he had retained a private investigator to assist with the defendant's case. Davila represented to the court that he was "ready, willing, and able" to continue serving as the defendant's attorney. At this point, the proceedings continued, with Davila representing the defendant.

On June 1, 2009, the second day of jury selection, the defendant filed another motion to dismiss attorney

Davila. The court noted that the motion raised the same issues as did the first motion, namely, a lack of communication and a breakdown in the attorney-client relationship. The court again explained to the defendant that if he did not want to proceed with Davila, it was not going to appoint a new lawyer, and, therefore, the defendant would have to represent himself. This time, the defendant indicated that he wanted to represent himself. After explaining at length the risks of proceeding without a lawyer and the seriousness of the charges that the defendant faced, the court granted the defendant's motion, appointing Davila as standby counsel.

The defendant objected to the court's ruling, arguing that he had a sixth amendment right to have a different attorney appointed to represent him. The court rejected the defendant's claim and repeated the options of proceeding with Davila or representing himself. The defendant responded: "Well, if that's the case, Your Honor, then I object to everything that's going on, and I refuse to cooperate, Your Honor." After the defendant indicated that he did not want to represent himself and repeated that he was refusing to cooperate, the court ordered Davila to represent the defendant, unless and until the defendant indicated that he wanted to represent himself.

The defendant renewed his objection to "everything that's going on" on June 4, 2009. He asserted that the court had stated inaccurately on June 1, 2009, that his right to self-representation under the sixth amendment had "changed . . . ." The court noted his objection, urged him to cooperate with the process and continued with the ongoing jury selection.

We review the court's refusal to appoint new counsel for an abuse of discretion. "[T]here is no unlimited opportunity to obtain alternate counsel. . . . It is within the trial court's discretion to determine whether

a factual basis exists for appointing new counsel." (Internal quotation marks omitted.) *State* v. *Flanagan*, 293 Conn. 406, 429, 978 A.2d 64 (2009). "Moreover, absent a factual record revealing an abuse of that discretion, the court's failure to allow new counsel is not reversible error." *State* v. *Drakeford*, 202 Conn. 75, 83, 519 A.2d 1194 (1987).

"A defendant has no unbridled right to discharge counsel *on the eve of trial.* . . . In order to work a delay by a last minute discharge of counsel there must exist exceptional circumstances." (Emphasis in original; internal quotation marks omitted.) Id., 83–84. "The right to counsel . . . does not include . . . an unlimited opportunity to obtain alternate counsel . . . or the absolute right to counsel of one's choice that must give way to the need for fair and efficient administration of justice." (Citations omitted.) *State* v. *Jones*, 22 Conn. App. 303, 307, 577 A.2d 293 (1990).

"While a criminal defendant's right to be represented by counsel implies a degree of freedom to be represented by counsel of [the] defendant's choice . . . this guarantee does not grant a defendant an unlimited opportunity to obtain alternate counsel on the eve of trial. . . . Although the court has a responsibility to inquire into and to evaluate carefully all substantial complaints concerning court-appointed counsel . . . the extent of such inquiry lies within the court's sound exercise of discretion. After it has given the defendant an adequate opportunity to inform it of his or her complaints, the court has broad discretion in determining whether circumstances warrant the appointment of new counsel or the dismissal of the defendant's existing counsel." (Internal quotation marks omitted.) *State* v. *Williams*, 102 Conn. App. 168, 205, 926 A.2d 7, cert. denied, 284 Conn. 906, 931 A.2d 267 (2007).

In *State* v. *David M.*, 109 Conn. App. 172, 950 A.2d 599, cert. denied, 289 Conn. 924, 958 A.2d 154 (2008),

this court held that the defendant's bare assertions that his defense counsel had threatened to "mess [his] case up" were not enough to warrant a change in counsel immediately before sentencing. (Internal quotation marks omitted.) Id., 177. This court also concluded that a change in counsel was not warranted in *State* v. *Jenkins*, 70 Conn. App. 515, 800 A.2d 1200, cert. denied, 261 Conn. 927, 806 A.2d 1062 (2002), in which the defendant indicated to the court on the first day of jury selection that he did not "feel comfortable" with his public defender. Id., 521. Later in the jury selection process, the defendant in *Jenkins* reiterated his request for new counsel, claiming that communication had broken down between him and his public defender. Id., 521–22. This court held that the trial court did not abuse its discretion in denying these requests, maintaining that "[t]he defendant's representations that he perceived a breakdown in communications with [his public defender], that he did not feel 'comfortable' with [his public defender] or that he did not 'feel' that he was being properly represented did not create even the semblance of a factual record to support a finding of good cause or exceptional circumstances to warrant a change in counsel." Id., 524–25.

The extent of the factual basis for removing Davila alleged by the defendant was that Davila conducted himself unprofessionally and that Davila did not communicate effectively with him. The defendant did not substantiate these claims in either of his motions to remove Davila or in his exchanges with the court when it considered the motions. The defendant asserted that there had been communication problems with Davila, but he did not raise any particular instances to the court, describing only the more general reservation that "I just don't feel safe with him . . . ."

The court did not abuse its discretion in denying the defendant's request for the appointment of new counsel

on the eve of trial. The defendant did not describe any exceptional circumstances that required the discharge of Davila, and our review of the record reveals no such circumstances. The defendant's general allegations of misconduct, detached from any factual record of misconduct, present an even weaker argument for a change in counsel than those made by the defendant in *David M.*, which this court also rejected as a basis for the appointment of new counsel. Unlike the defendant in *David M.*, here the defendant did not reference any specific threat or instance of unprofessionalism that the court should find to be a basis for the appointment of new counsel. Furthermore, the defendant's claim that communication had broken down between him and Davila and that he had "a feeling inside" that he could not rely on Davila is indistinguishable from the unsuccessful argument made by the defendant in *Jenkins*. In both *Jenkins* and the present case, the defendants argued that defense counsel should be replaced on the basis of an abstract, unsubstantiated feeling that counsel could not be trusted. As we held in *Jenkins*, such a claim, unsupported by facts in the record, is insufficient to warrant a finding of exceptional circumstances that requires a change in counsel.

B ·

Second, the defendant claims[2] that the court failed to canvass him properly regarding his right to represent himself in violation of his due process right to a fair trial under the sixth amendment to the United States

---

[2] Although the state argues that this claim is not preserved, we conclude as we did in part I A of this opinion that the state inappropriately has applied our Supreme Court's holding in *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), to the question of whether the claim was preserved. See footnote 1 of this opinion. Furthermore, we conclude that the defendant took appropriate steps at trial to preserve this claim for our review. Both of the defendant's motions specifically alleged violations of the sixth amendment to the United States constitution, and the defendant argued their merits before the court.

constitution.[3] The defendant argues that he properly invoked his right to self-representation and that the court's ensuing inquiry failed to elicit information establishing the voluntariness of his decision. The defendant maintains that the court, rather than informing him of the dangers of self-representation, inappropriately attempted to dissuade him from representing himself and effectively denied him his right to self-representation. We disagree.

The right to self-representation is guaranteed under both the state and federal constitutions, and is effectuated by our rules of practice.[4] "There is no doubt that a defendant has a right under both the state and the federal constitutions to represent himself at his criminal trial. . . . The constitutional right of self-representation depends, however, upon its invocation by the defendant in a clear and unequivocal manner." (Citations omitted.) *State* v. *Carter*, 200 Conn. 607, 611–12, 513 A.2d 47 (1986). "In the absence of a clear and unequivocal assertion of the right to self-representation, a trial court has no independent obligation to inquire

---

[3] The defendant also claims that the court's actions violated his rights under article first, §§ 8 and 20, of the constitution of Connecticut. Because he has undertaken no independent analysis of his state constitutional claim, however, we consider only his claim under the federal constitution. See, e.g., *State* v. *Melendez*, 291 Conn. 693, 704 n.16, 970 A.2d 64 (2009).

[4] Practice Book § 44-3 provides: "A defendant shall be permitted to waive the right to counsel and shall be permitted to represent himself or herself at any stage of the proceedings, either prior to or following the appointment of counsel. A waiver will be accepted only after the judicial authority makes a thorough inquiry and is satisfied that the defendant:

"(1) Has been clearly advised of the right to the assistance of counsel, including the right to the assignment of counsel when so entitled;

"(2) Possesses the intelligence and capacity to appreciate the consequences of the decision to represent oneself;

"(3) Comprehends the nature of the charges and proceedings, the range of permissible punishments, and any additional facts essential to a broad understanding of the case; and

"(4) Has been made aware of the dangers and disadvantages of self-representation."

into the defendant's interest in representing himself, because the right of self-representation, unlike the right to counsel, is not a critical aspect of a fair trial . . . but instead affords protection to the defendant's interest in personal autonomy." (Internal quotation marks omitted.) *State* v. *Jones*, 281 Conn. 613, 648, 916 A.2d 17, cert. denied, 552 U.S. 868, 128 S. Ct. 164, 169 L. Ed. 2d 112 (2007).

"State and federal courts consistently have discussed the right to self-representation in terms of invoking or asserting it . . . and have concluded that there can be no infringement of the right to self-representation in the absence of a defendant's proper assertion of that right. . . . The threshold requirement that the defendant clearly and unequivocally invoke his right to proceed pro se is one of many safeguards of the fundamental right to counsel. . . .

"To invoke his [s]ixth [a]mendment right [to self-representation] . . . a defendant does not need to recite some talismanic formula hoping to open the eyes and ears of the court to his request. Insofar as the desire to proceed pro se is concerned, [a defendant] must do no more than state his request, either orally or in writing, unambiguously to the court so that no reasonable person can say that the request was not made." (Citations omitted; internal quotation marks omitted.) *State* v. *Flanagan*, supra, 293 Conn. 422–24.

Our case law has refined what actions constitute a clear and unambiguous invocation of the right to self-representation. Our Supreme Court in *Carter* explained that a defendant makes a clear and unambiguous request to proceed as a self-represented party when he or she makes "a definitive assertion of a request to proceed pro se." *State* v. *Carter*, supra, 200 Conn. 614. Additionally, we have noted that "mere expressions of dissatisfaction with counsel's performance do not

constitute a clear and unequivocal invocation of the right to self-representation. . . . Neither does vacillation between the options of proceeding pro se or with counsel suffice." (Citations omitted.) *Quint* v. *Commissioner of Correction*, 99 Conn. App. 395, 404–405, 913 A.2d 1120 (2007).

We conduct plenary review of whether the defendant clearly and unambiguously requested that he be allowed to represent himself. See *State* v. *Flanagan*, supra, 293 Conn. 420. The defendant argues that there were three distinct occasions when he requested that he be allowed to represent himself and triggered the requirement of a canvass. We will address each occasion separately.

1

The defendant argues that he made his first request to represent himself in his May 28, 2009 letter to the court, which the court considered on the first day of jury selection. This letter requested that the court "enter [his] appearance . . . ." The defendant filed this letter with an accompanying motion to dismiss Davila and appoint new counsel. On May 28, 2009, the court inquired into these apparently contradictory requests:

"The Court: . . . The first matter that I need to clear up in my mind is your motion to, in effect, discharge Mr. Davila, who is apparently your special public defender. I mean, I know he's a lawyer, but it appears that he is your—was appointed by the court to represent you. And the motion further goes on to indicate, and 'appoint an attorney.' Now, that's different than what you have indicated by virtue of having entered what we call the pro se appearance. What a pro se appearance means is that you intend to represent yourself in this matter, so I need to clear that up first. Are you asking to dismiss attorney Davila and to have an attorney appointed for you or are you asking that I dismiss attorney Davila and that you represent yourself?

"[The Defendant]: I'm asking that you dismiss attorney Davila and appoint me a new one, Your Honor.

"The Court: Okay. So, in other words, this appearance form where you represent yourself is just a misunderstanding on your part; is that a fair statement?

"[The Defendant]: Yes, Your Honor."

We conclude, on the basis of this exchange, that the defendant did not request that he be allowed to represent himself in his May 28, 2009 letter. Rather, as the court clarified, the letter reflected a misunderstanding on the part of the defendant—at that point, he was requesting that the court appoint new counsel, not that the court allow him to represent himself. After the court denied his motion, it asked him if he wanted to represent himself instead of being represented by Davila. The defendant reiterated that he did not want to represent himself. A further canvass, therefore, was not required at this time.

2

On June 1, 2009, the defendant filed his second motion to dismiss Davila, which again requested that the court appoint new counsel. The motion, by its terms, did not request that the court allow him to represent himself. Rather, it sought the appointment of new counsel.[5] After allowing the defendant to be heard on this motion, the court explained that, as it had already denied his request for new counsel, if he wanted to remove Davila, he would in effect be electing to represent himself. In response, the defendant indicated that he wanted to represent himself.

[5] It should be noted that the motion began by stating: "Now comes [the defendant], pro se, with a Motion for Dismissal of Court Appointed Counsel . . . ." We conclude that this inclusion of the term "pro se," however, did not amount to a clear and unambiguous request by the defendant to represent himself, especially when the motion listed explicitly in its request for relief that the court appoint new counsel.

The court responded to this request with a lengthy explanation of the various risks associated with self-representation. The court emphasized Davila's skill and expertise with the criminal law and discussed the seriousness of the charges that the defendant was facing. It then inquired as to the defendant's educational background, his experience with the court system and whether he understood the consequences of conviction. The court also emphasized the dangers of self-representation. In the course of doing so, the court remarked:

"[T]he United States constitution and, frankly, the Connecticut constitution gives you the right to represent yourself under certain circumstances and, if that's what you want to do, I'll let you do it, but, you know, there's a saying, 'Only a fool represents himself,' because you just don't seem to understand what you face here . . . .

"[Y]ou want to dismiss your attorney. That means you're going to give up the right to have a lawyer who has been appointed and will be paid for by the state and who is an excellent lawyer in the criminal law. You want to give that up in order to represent yourself and, frankly, you may be seeing that I'm looking down—I'm looking down because there are certain rights that I need to discuss with you pursuant to our law, and that's just what I'm doing. You know, you're cooking your own goose, but if that's what you want to do, I'm frankly going to dot the I's and cross the T's."

Following these warnings, the defendant indicated that he still wanted to represent himself. The court granted this request, appointing Davila as standby counsel. The defendant indicated that he did not understand the court's ruling, stating that he thought he had a sixth amendment right to have a new attorney appointed. The court responded: "[T]he answer to that is you're not going to get another attorney. I already explained

that to you. We started the trial, we picked jurors, you have no right nor do I intend to give you for the reasons you've given to me because they're baseless, in my mind. There's absolutely no reason the state of Connecticut should retain another attorney for you when you have an excellent attorney sitting next to you. I have watched him, I am satisfied beyond a reasonable doubt that he is an excellent lawyer and you're very lucky to have him but, again, only because the law says that I have to comply with your request [to represent yourself], if that's what you want, I am letting you appear for yourself." At this point, the defendant noted his objection to "everything that's going on" and indicated that he was "refus[ing] to cooperate" further. The following colloquy between the court and the defendant ensued:

"The Court: . . . So, my understanding based upon what I've heard is that you do want counsel to do those things that I talked about and that because I'm not appointing a lawyer for you, you object, and I understand that, but you have in effect withdrawn your request, your further request to represent yourself; is that correct?

"[The Defendant]: I still don't understand, Your Honor.

"The Court: Well, I can't make it any clearer to you. You have two options, Mr. Turner; either represent yourself or have Mr. Davila represent you. What are your choices?

"[The Defendant]: I don't want Davila to represent me, Your Honor.

"The Court: Do you want to represent yourself?

"[The Defendant]: No, Your Honor. I want appointed an attorney to me, Your Honor.

"The Court: Well, you don't have that option. I've denied it, you've made an objection, it's on the record, so we're back to square one, I guess.

"[The Defendant]: Well, then I refuse to cooperate, Your Honor.

"The Court: Okay. That's fine. Counsel, you'll remain in and you will represent [the defendant] unless and until he decides he wishes to represent himself because, for the moment, based upon that statement, I'm not satisfied that there's been an intelligent waiver of defendant's right to counsel; do you understand that? At any time you want to represent yourself, just stand up and tell me, okay?

"[The Defendant]: I don't want him as my lawyer, Your Honor.

"The Court: Okay. Then, what do you want? You want to sit there and not have anybody represent you?

"[The Defendant]: No. I want to have another attorney appointed to me, Your Honor.

"The Court: Oh, I hear you. You're not getting that. I'm not going to waste a lot of time with this. You're playing games, you're not getting another attorney. If I'm wrong, an appellate court, should that become necessary, will tell me I'm wrong. You want to talk about—

"[The Defendant]: I'd rather just go downstairs.

"The Court: I could give you that choice, too, but you realize if you decide you want to go downstairs you're not going to go in a room where you can hear what is going on? Do you understand, then, you will not be able to play any part in assisting your attorney in picking jurors as you did before and in being a part of this process, and if you're convicted, then you can say, well, I didn't even have a chance to help my lawyer here? Do you understand that?

"[The Defendant]: But, Your Honor, it's my constitutional right to dismiss my attorney any time I want to, Your Honor.

"The Court: It is your constitutional right. I'm glad you understand the law to that extent, but if you excuse your lawyer, then you're either going to represent yourself or you're going to have [no] representation; do you understand that?

"[The Defendant]: No, Your Honor.

"The Court: Why don't you understand that? What part of you're either going to represent yourself or not have a lawyer that you don't understand, Mr. Turner, without playing games with me?

"[The Defendant]: Because I thought it was in the sixth amendment that I could have counsel appointed to me at any time.

"The Court: Well, now you're learning some new law. The new law is that you don't have that absolute right. So, I've explained that to you, okay? You're going to have to live with it unless and until a higher court indicates that I'm wrong, so get that all out of your head; you're not going to get a new lawyer. Now, that you understand that part, you seem to be a fairly bright—not fairly bright, you seem very bright, actually, based upon the preparation of this motion and my discussions with you. Let's go back to where we are. Do you want to represent yourself?

"[The Defendant]: To tell you the truth, if I had to take that choice to rather have him represent me, then I take it, but I just want another attorney, Your Honor.

"The Court: You made yourself clear. I understand what you want. Sometimes, you don't get everything you want in life. I don't get everything I want in life,

either, but this is your life. I strongly suggest that you cooperate.

"Counsel—we're going to start. Counsel, I'm going to ask that you continue in your role as attorney. We're going to take a brief recess in order to bring the panel down. The only other matter on this matter I will say to you, Mr. Turner, is this: Your motion to dismiss Mr. Davila is denied, and if at any time you decide that you want to represent yourself, that's your only other choice, just tell your lawyer, I'll excuse the jury, and you're going to [represent] yourself, and that's your only option, but for the moment we're going to take a brief recess, we're going to bring the panel down, and let's get some jurors selected here with your cooperation, I hope, because it's to your benefit. It doesn't affect me one way or the other, Mr. Turner. I'm not on trial."

Reviewing the court's consideration of the defendant's June 1, 2009 motion as a whole, we conclude that the defendant did not clearly and unambiguously request that the court allow him to represent himself. First, his June 1, 2009 motion called for the appointment of new counsel and did not contain a request to proceed as a self-represented party. Although the defendant did initially indicate that he wanted to represent himself, through his exchanges with the court, it became apparent that he still was seeking the appointment of new counsel. In the colloquy with the court noted previously, the defendant plainly stated on two separate occasions that he did not want to represent himself, after being warned about the risks of self-representation. The remark that "if I had to take that choice [of self-representation] to rather have him represent me, then I take it, but I just want another attorney, Your Honor," is neither clear nor unambiguous in context. The defendant's representations to the court in his motion to remove counsel were conflicting at best. This vacillation between invoking his right to self-representation

and indicating that he did not want to represent himself was not enough to trigger the requirement of a canvass pursuant to Practice Book § 44-3. See *Quint* v. *Commissioner of Correction*, supra, 99 Conn. App. 404–405.

The defendant argues that the court's comments, "if [the court] were to dismiss your lawyer you're going to be pro se," "[o]nly a fool represents himself," and, "you're cooking your own goose," amounted to an improper attempt to influence him to retain Davila as his counsel instead of representing himself and effectively took away the defendant's choice to represent himself. This claim is without merit. Practice Book § 44-3 (4) calls for the court to ensure that a defendant is "aware of the dangers and disadvantages of self-representation" before accepting a waiver of counsel. It was not only appropriate for the court to discuss the risks of self-representation, it was incumbent on it to do so. Furthermore, although the court strongly advised against self-representation, it left the decision regarding self-representation ultimately to him. This conclusion is supported by the fact that, on June 1, 2009, the court initially granted the defendant's request to proceed as a self-represented party and appointed Davila as standby counsel. The defendant then expressed his dissatisfaction with the court's ruling and later stated that he did not want to represent himself. Under the totality of the circumstances of this case, the defendant clearly understood that he had the option of representing himself, but he chose not to exercise that option.

3

The final occasion on which the defendant had a discussion with the court concerning his objections to proceeding with Davila's representation occurred on June 4, 2009. The defendant registered his general objection to "everything that's going on . . . ." When asked by the court to clarify the basis for his objection, the

defendant asserted that the court had stated inaccu-
rately that his right to self-representation under the
sixth amendment had "changed . . . ." He asserted:
"You said I was—I remember me telling you specifically
how in the sixth amendment is my right to self-counsel;
you told me the law changed. I don't remember every-
thing you said, I don't have the best memory in the
world, but I remember you specifically telling me it
changed, and I had someone look for me and it hasn't
changed, Your Honor." The court noted his objection,
urged him to cooperate with the process and continued
with the ongoing jury selection process.

We conclude that this was not a clear and unambigu-
ous invocation of the defendant's right to self-represen-
tation. The defendant's remarks appear to stem from
confusion over the court's comment on June 1, 2009,
that, "[w]ell, now you're learning some new law. The
new law is that you don't have that absolute right [to
have new counsel appointed at any time]." The defen-
dant appears to have misunderstood the court's com-
ments to mean that the sixth amendment had somehow
been changed recently, when in fact the court was
attempting to correct the defendant's misconception of
the rights that it affords. This complaint about how the
court had conducted the proceedings did not amount
to a request by the defendant to represent himself. As
he did not make a clear and unambiguous request to
proceed as a self-represented party at any point during
the proceedings, there was no violation of his sixth
amendment right to self-representation.[6]

---

[6] In addition to his sixth amendment claim, the defendant alleges that the
court's various statements throughout the course of the trial encouraging
him to retain Davila as his counsel instead of proceeding as a self-represented
party rose to the level of the criminal offense of coercion in violation of
General Statutes § 53a-192. Section 53a-192 (a) provides: "A person is guilty
of coercion when he compels or induces another person to engage in conduct
which such other person has a legal right to abstain from engaging in, or
to abstain from engaging in conduct in which such other person has a legal
right to engage, by means of instilling in such other person a fear that, if
the demand is not complied with, the actor or another will: (1) Commit any

## C

Third, the defendant claims[7] that the court improperly denied him his counsel of choice in violation of his sixth amendment right to counsel of his choice.[8] The defendant asserts that the sixth amendment mandates

criminal offense; or (2) accuse any person of a criminal offense; or (3) expose any secret tending to subject any person to hatred, contempt or ridicule, or to impair any person's credit or business repute; or (4) take or withhold action as an official, or cause an official to take or withhold action."

The defendant's cavalier assertion of criminal conduct on the part of the trial court is inappropriate because it is not supported by a serious analysis and is wholly without merit. He cites to no authority that suggests that the court's actions amounted to the crime of coercion in violation of § 53a-192. Clearly, our rules of practice and case law support the conclusion that the comments were appropriate under the circumstances. Practice Book § 44-3 (4) provides that a court is obligated to ensure that a defendant is "aware of the dangers and disadvantages of self-representation" before accepting a waiver of counsel. In *State* v. *Webb*, 238 Conn. 389, 680 A.2d 147 (1996), aff'd after remand, 252 Conn. 128, 750 A.2d 448, cert. denied, 531 U.S. 835, 121 S. Ct. 93, 148 L. Ed. 2d 53 (2000), our Supreme Court held that Practice Book § 961, now § 44-3, was satisfied when the court admonished the defendant that proceeding as a self-represented party would be to his disadvantage and that "the [c]ourt has indicate[d] only a fool represents himself. Even lawyers have lawyers." (Internal quotation marks omitted.) Id., 426. The court's comments in the present case were similar to those made by the court in *Webb*, including the remark that "[o]nly a fool represents himself," the alleged impropriety of which the defendant makes a particular issue. The court appropriately described the dangers of self-representation to the defendant, especially given the serious nature of the crime with which he was charged. The court also repeatedly stated that the ultimate decision regarding whether he would proceed with Davila rested with the defendant. Far from being criminal or even improper, the court's clear warnings that proceeding as a self-represented party carried with it serious risks were a crucial step of the process of obtaining a valid waiver of counsel under Practice Book § 44-3.

[7] As it did with respect to the defendant's claims in parts I A and I B of this opinion, the state argues that the defendant did not preserve this claim. We reject the state's argument here, as we did above, because we conclude that the defendant took appropriate steps at trial to preserve this claim for our review. See footnotes 1 and 2 of this opinion.

[8] The defendant alleges that his rights under the constitution of Connecticut also were violated, but he fails to undertake an independent analysis of these purported violations of state constitutional rights. Therefore, we do not consider this aspect of his claim. See footnote 4 of this opinion.

a presumption in favor of the court accepting his choice of counsel. He argues that the court improperly failed to make such a presumption, and, in fact, that it made the opposite presumption in favor of rejecting his choice of counsel. Furthermore, according to the defendant, this error requires this court to conclude that he was prejudiced. This argument has no merit.

The following additional facts are relevant to the defendant's claim. On May 28, 2009, after the defendant informed the court that he wanted to be heard on his first motion to remove court-appointed counsel, the court gave the following admonition:

"The Court: . . . [Y]ou have certainly the right to move to dismiss Mr. Davila, and I'll listen to you, but just because you dismiss him doesn't mean you're going to get a new lawyer on the eve of trial, in all candor, unless you can give me a better reason than you've already given me. Most probably not. I haven't made a decision yet. Most probably, I'll deny that request. It is on the eve of trial, we are going to start jury selection. That would leave you—assuming I were to decide that [you would be] representing yourself, and that would be a very unwise move on your part until you've had some formal legal education, particularly in the criminal law or you're versed enough to go against a very seasoned and experienced state's attorney. . . . He is well versed in many serious criminal law matters, and you need a lawyer who's going to be able to, in effect, advocate for you in the way that [the prosecutor] is going to be able to advocate for the state, meaning present to the jury what each side feels is important for this jury to decide your guilt or nonguilt.

"All I'm trying to tell you is, Mr. Turner, don't write off Mr. Davila too quick. You may end up representing yourself and, again, you have a constitutional right to do that, at least for me to consider that, whether I'm

going to let you represent yourself or whether I'm going to appoint another attorney for you, but I really think you're being hasty, particularly now that you know you're going to have sufficient time."

Our Supreme Court has explained the sixth amendment right to counsel of choice. "[T]he guarantee of assistance of counsel under the sixth amendment to the United States constitution encompasses the right to select one's own attorney. It is hardly necessary to say that, the right to counsel being conceded, a defendant should be afforded a fair opportunity to secure counsel of his own choice. . . .

\* \* \*

"We recognize, however, that the right to counsel of choice is not absolute. . . . When a defendant's selection of counsel seriously endangers the prospect of a fair trial, a trial court justifiably may refuse to agree to the choice. . . .

\* \* \*

"Finally, it is well settled that if the decision by a trial court deprived a defendant of his constitutional right to counsel of choice, prejudice will be presumed." (Citations omitted; internal quotation marks omitted.) *State* v. *Peeler*, 265 Conn. 460, 470–75, 828 A.2d 1216 (2003), cert. denied, 541 U.S. 1029, 124 S. Ct. 2094, 158 L. Ed. 2d 710 (2004).

The court did not reject the defendant's choice of counsel. Rather, the court declined his request to appoint new counsel. As is clear from considering our Supreme Court's decision in *Peeler*, the jurisprudence on which the defendant relies in making this claim contemplates a situation in which a criminal defendant attempts to retain private counsel of his or her choice but the court rejects this choice of counsel on the ground that it endangers the prospect of a fair trial. In

the present case, the court appointed the defendant a public defender to represent him. It then denied the defendant's motion to remove this public defender in favor of new counsel. This refusal to remove his counsel and appoint new counsel is reviewed for an abuse of discretion; see part I A of this opinion; and is a different issue from that discussed in *Peeler*. The defendant, therefore, has no cognizable claim that the court improperly rejected his choice of counsel.

## D

Finally, the defendant claims that the court's refusal to appoint counsel of his choice violated his state and federal constitutional rights to equal protection of the laws. The defendant asserts that although they are neutral on their face, Practice Book §§ 3-9 and 3-10 must be treated as if they create impermissible classifications on the basis of indigency due to their disparate impact on indigent criminal defendants. According to the defendant, the office of chief public defender routinely does not grant permission to indigent defendants to obtain new counsel and improperly considers economic factors and the effects on the efficient administration of criminal trials of freely giving indigent defendants their choice of counsel. The defendant maintains that the issue is preserved. In the alternative, if it is not preserved, he asserts that the claim is either reviewable under *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989), as constitutional error or that it is a ground for reversal of his conviction under the plain error doctrine. See Practice Book § 60-5. We disagree and decline to review the claim.

Ordinarily, this court will not consider a claim that was not raised properly at trial. See Practice Book § 60-5. "The sine qua non of preservation is fair notice of the claim to the trial court. . . . [T]he essence of the preservation requirement is that fair notice be given to

the trial court of the party's view of the governing law . . . . A secondary purpose of the preservation requirement is to prevent the possibility that an appellee would be lured into a course of conduct at the trial which it might have altered if it had any inkling that the [appellant] would . . . claim that such a course of conduct involved rulings which were erroneous and prejudicial to him." (Internal quotation marks omitted.) *State* v. *Lahai*, 128 Conn. App. 448, 465–66, 18 A.3d 630, cert. denied, 301 Conn. 934, 23 A.3d 727 (2011).

The defendant's equal protection claim is not preserved. The defendant contends that the court heard argument regarding his two motions for removal of counsel and that this preserves his equal protection claim. We do not agree. The defendant's May 28, 2009 motion referred to his "[s]ix [a]mendment right to legal assistance and statutory right to appointed counsel and expert." Similarly, his June 1, 2009 motion invoked his "[c]onstitutional [r]ight to a fair trial and to adequate representation . . . ." Unsurprisingly, both motions focused on the defendant's allegations of sixth amendment violations. The defendant never referred to federal or state constitutional provisions concerning equal protection. He also failed to make either a claim in his motions or a comment to the court that it reasonably should have identified as raising an equal protection issue.

Furthermore, we conclude that the claim is not entitled to *Golding* review. Under *Golding*, "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to

demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. . . .

"The defendant bears the responsibility for providing a record that is adequate for review of his claim of constitutional error. If the facts revealed by the record are insufficient, unclear or ambiguous as to whether a constitutional violation has occurred, we will not attempt to supplement or reconstruct the record, or to make factual determinations, in order to decide the defendant's claim." (Emphasis in original.) *State* v. *Golding*, supra, 213 Conn. 239–40.

The defendant's claim does not satisfy the first prong of *Golding*. In his brief to this court, the defendant makes various factual claims related to the treatment of indigent criminal defendants in our criminal justice system. The defendant acknowledges that the rules governing the withdrawal of counsel are neutral on their face and apply to all criminal defendants. His claim, therefore, turns on an alleged disparate impact that the rules have on indigent criminal defendants. Without further parsing the argument or considering its merits, it is clear that no such disparate impact could be demonstrated without an adequate evidentiary record. The defendant would have to demonstrate some factual basis for his assertion that indigent criminal defendants are affected disproportionately by Practice Book §§ 3-9 and 3-10 by virtue of being indigent. The defendant alleges facts in his brief to this court that, he argues, provide a basis for such a claim. These facts, however, are not a part of the record. It is not the proper role of this court to find facts, and it is improper for a party before this court to supplement the record with factual allegations not made at trial. See id., 240. Accordingly, the claim fails to satisfy the first prong of *Golding* and is not entitled to *Golding* review.

Finally, we reject the defendant's assertion that his unpreserved equal protection claim is a ground for

reversal of his conviction under the plain error doctrine. See Practice Book § 60-5. As our Supreme Court has explained: "The plain error doctrine is a rule of reversibility reserved for truly extraordinary situations where the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings. . . . That is, it is a doctrine that this court invokes in order to rectify a trial court ruling that, although either not properly preserved or never raised at all in the trial court, nonetheless requires reversal of the trial court's judgment, for reasons of policy. . . . [Thus, an appellant] cannot prevail under [the plain error doctrine] . . . unless he demonstrates that the claimed error is both so clear and so harmful that a failure to reverse the judgment would result in manifest injustice." (Citation omitted; internal quotation marks omitted.) *State* v. *Roger B.*, 297 Conn. 607, 618, 999 A.2d 752 (2010).

The defendant has not provided us with a sufficient record on which we can conclude that the court violated his equal protection rights such that it committed plain error. As discussed in part I A of this opinion, the defendant did not allege a factual basis that called for Davila's removal, expressing only generalized, abstract reservations about going forward with Davila's representation. The defendant also did not put forward properly any facts whatsoever supporting his claim of a systemic injustice in our procedural rules that resulted in a violation of his equal protection rights. The record being devoid of any such factual support, we do not conclude that the court committed a violation of his rights to equal protection that affected the integrity of his trial such that failure to reverse his conviction would amount to a manifest injustice.

II

Next, the defendant claims that the court improperly denied his motion for a judgment of acquittal when the

evidence was insufficient to convict him of murder. The defendant argues that (1) none of the witnesses actually saw him shoot the victim, (2) the video surveillance recordings did not show him shooting the victim and (3) the video surveillance recordings were enhanced improperly by the police and were unreliable. We do not agree.

The jury had before it the following testimony that described the events of June 20, 2007. Immediately before he was shot, the victim met with Johnson on the sidewalk just outside of Ernie's Café. Johnson noticed while talking to the victim that he appeared to be intoxicated, and she told him that she was going to drive them home. Alexander was on the sidewalk across the street smoking a cigarette, and she saw the victim but did not immediately see anyone else due to traffic on Bank Street. Alexander testified, however, that she then observed an individual wearing a black hat standing near the victim.

At this time, the victim was shot. Johnson's head was turned away from the victim when she heard the gunshot, and she did not see who fired the gunshot. Alexander heard the gunshot and saw the victim falling to the ground, but she did not see the shooting.

The night the victim was shot, the defendant was at Ernie's Café with McGill and another friend, Jonathan Fuller. Fuller testified that the defendant was wearing a black hat. At some point, the defendant indicated that he had to "go outside real quick" and left the bar on his own. Moments thereafter, the victim was shot. McGill and Fuller then exited the bar in response to the gunshot, where they met up with the defendant again before leaving together. Fuller testified that the defendant indicated to him that he did not witness the shooting and that he ran to their car when he heard the gunshot.

Ernie's Café had ten surveillance cameras operating on June 20, 2007. Certain video recordings from these cameras, showing the interior of the bar and a view of the entrance to the bar from the inside around the time of the shooting, were admitted into evidence. The recordings included footage of three individuals, identified through testimony as McGee, Fuller and the defendant, present in the bar on the night of the shooting. One camera inside of the bar showed the front entrance to the building. At the time of the shooting, the doors to the front entrance of the building were propped open, so the camera contained a view of the sidewalk just outside of the bar. This camera recorded images that depicted an individual identified as the defendant walking out of the bar through the front entrance at the time of the shooting while reaching into his waistband. The camera then captured a person on the sidewalk just outside of the bar collapsing to the ground, and the individual identified as the defendant stepping over the body and walking away down the street.

"The standard of appellate review of a denial of a motion for a judgment of acquittal has been settled by judicial decision. . . . The issue to be determined is whether the jury [reasonably could have] concluded, from the facts established and the reasonable inferences which could be drawn from those facts, that the cumulative effect was to establish guilt beyond a reasonable doubt. . . . The facts and the reasonable inferences stemming from the facts must be given a construction most favorable to sustaining the jury's verdict. . . . It is established case law that when a defendant challenges the sufficiency of the evidence, we apply a twofold test. We first review the evidence . . . in the light most favorable to sustaining the jury's verdict. We then determine whether, upon the facts thus established and the inferences reasonably drawn . . . the jury [reasonably could] have concluded that the

cumulative effect of the evidence established guilt beyond a reasonable doubt . . . . In this process of review, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct." (Internal quotation marks omitted.) *State* v. *Nero*, 122 Conn. App. 763, 794–95, 1 A.3d 184 (2010).

Although the defendant claims that there was no direct evidence to support the jury's verdict, such as eyewitnesses who saw him shoot the victim or video surveillance recordings that show him shooting the victim, direct evidence is not required for conviction. See id. It is enough that the jury found that the cumulative effect of the surveillance recordings, considered in conjunction with the testimony of the witnesses at trial, established guilt beyond a reasonable doubt.

The defendant also asserts that the police "created and enhanced the videotaped evidence specifically for presentation to the jury in court" and that this rendered the recordings "unreliable and unnecessarily suggestive." We are not persuaded. The defendant's argument in effect questions both the admissibility of and the weight of the evidence. First, the contention that the recordings were "unnecessarily suggestive" implicitly suggests that they should not have been admitted into evidence. At trial, however, the defendant did not object to the admission of the recordings. To the extent that the defendant now takes issue with their admission, he makes an unpreserved evidentiary claim that we will not review on appeal. See *State* v. *Robinson*, 129 Conn. App. 331, 336–37, 19 A.3d 259 (2011).

Second, the defendant's argument that the recordings were "unreliable" goes to the weight of the evidence. Whether the recordings were reliable, however, was a matter for the jury to decide. See, e.g., *State* v. *Serrano*, 123 Conn. App. 530, 543, 1 A.3d 1277 (2010), cert. denied, 300 Conn. 909, 12 A.3d 1005 (2011). The forensics expert

who enhanced the recordings testified with regard to his process for clarifying the recordings for trial. He explained that he brightened them, slowed them down, magnified them and utilized various filters in an attempt to make them clearer. He also noted that the recordings had a low resolution and frame rate, which made them difficult to clarify. The defendant had a right to attempt to persuade the jury that, on the basis of this testimony, it should not rely on the recordings, as the state suggested it should. During closing arguments, Davila did in fact make such an attempt: "It's not clear. The state's right. It's not a clear video. We don't know, we can't really tell what happened. It's grainy, it was grainy to the point that they had to get [someone from the Federal Bureau of Investigation] to enhance it so that they could use it and they could try and identify the people there." It was within the province of the jury to consider the recordings together with the testimony of this expert in assessing their reliability.

After reviewing the record as a whole, we conclude that the evidence was sufficient to convict the defendant. The jury reasonably could have found that the defendant threatened to kill the victim the night before the shooting occurred. Furthermore, the jury reasonably could have found that the video surveillance recordings showed the defendant exiting Ernie's Café while reaching into his waistband and the victim falling to the ground as the defendant approached him. On the basis of this evidence, the jury could have found beyond a reasonable doubt that the defendant was guilty of murder in violation of § 53a-54a (a).

The judgment is affirmed.

In this opinion the other judges concurred.