******************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************

# MIGUEL VEGA *v.* COMMISSIONER
# OF CORRECTION
# (SC 21017)

Mullins, C. J., and McDonald, D'Auria, Ecker,
Alexander, Dannehy and Bright, Js.

*Syllabus*

The petitioner appealed, on the granting of certification, to this court from the judgment of the Appellate Court, which had dismissed his appeal from, inter alia, the habeas court's denial of his habeas petition. The petitioner, who had been convicted of murder, among other crimes, claimed in his habeas petition that he had been deprived of his right to a fair trial when the prosecutor at his criminal trial failed to disclose that one of the state's witness at that trial, P, had previously provided false testimony at a trial in another, unrelated case that was handled by another state's attorney who worked, along with the prosecutor, in the state's attorney's office in the New London judicial district. After the petitioner was sentenced in his criminal case, the Appellate Court reversed the conviction of the defendant in the unrelated case, concluding that the state's failure to correct P's false testimony in that case violated *Brady* v. *Maryland* (373 U.S. 83). In dismissing the petitioner's appeal from the habeas court's judgment, the Appellate Court concluded, inter alia, that the prosecutor in the petitioner's criminal case had no obligation to review the file in the unrelated case for impeachment material concerning P in the absence of a specific request for such material by the defense. On appeal to this court, the petitioner claimed, inter alia, that, contrary to the Appellate Court's conclusion, the prosecutor in his criminal case had an obligation to seek out and to disclose to the defense the fact that P had previously given false testimony in the unrelated case. *Held*:

Although the Appellate Court incorrectly concluded that the prosecutor in the petitioner's criminal trial had no responsibility to seek out and to disclose to the defense evidence of P's false testimony at the unrelated trial, this court upheld the Appellate Court's dismissal of the petitioner's appeal on the alternative ground that the prosecutor's failure to disclose that evidence was immaterial for purposes of *Brady*.

The state's attorney's office for the New London judicial district is a single entity that speaks for the state on criminal matters in that district, and, therefore, the state's attorney in that district prosecuting the petitioner's criminal trial was not relieved of his *Brady* obligations simply because he was not personally aware of the existence of exculpatory evidence in the same state's attorney's office relating to the petitioner's criminal trial.

Accordingly, the prosecutor's duty under *Brady* extended in the petitioner's criminal case to exculpatory information involving P that, although unknown to that prosecutor, was known to another prosecutor in the same state's attorney's office in an unrelated matter.

The exculpatory information involving P was not so remote in relevance or scope that it was unreasonable to require the prosecutor in the petitioner's criminal trial to have sought it out and disclosed it, as that information pertained to the same witness the state called to testify in two murder cases that proceeded to trial in the New London judicial district and whose testimony in one of those trials was the subject of an ongoing habeas proceeding handled by one of twelve prosecutors in that same judicial district.

Nevertheless, this court concluded that the prosecutor's failure to disclose P's false testimony to the defense did not violate the petitioner's due process rights insofar as there was no reasonable probability that such disclosure would have changed the outcome of the petitioner's criminal trial.

Specifically, P's testimony at the petitioner's criminal trial was far from dispositive, there having been four other eyewitnesses at that trial who were familiar with the petitioner and who identified him as the shooter, evidence of the petitioner's motive and consciousness of guilt, and effective impeachment of P on cross-examination by defense counsel.

Argued October 29, 2025—officially released April 21, 2026

*Procedural History*

Amended petition for a writ of habeas corpus, brought to the Superior Court in the judicial district of Tolland and tried to the court, *Newson, J.*; judgment denying the petition; thereafter, the court denied the petition for certification to appeal, and the petitioner appealed to the Appellate Court, *Moll, Clark* and *Eveleigh, Js.*, which dismissed the appeal, and the petitioner, on the granting of certification, appealed to this court. *Affirmed in part*; *vacated in part*.

*Robert L. O'Brien*, assigned counsel, with whom, on the brief, was *Christopher Y. Duby*, assigned counsel, for the appellant (petitioner).

*Denise B. Smoker*, senior assistant state's attorney, with whom, on the brief, were *Paul J. Narducci*, state's attorney, and *Donna Fusco*, deputy assistant state's attorney, for the appellee (respondent).

*Opinion*

D'AURIA, J. In this certified appeal, we consider whether the Appellate Court correctly concluded that, pursuant to *Brady* v. *Maryland*, 373 U.S. 83, 83 S. Ct.

1194, 10 L. Ed. 2d 215 (1963), and its progeny, the prosecutor in the petitioner's criminal case had no responsibility, absent actual knowledge of *Brady* material, to review files in unrelated cases being litigated by the same office for exculpatory or impeachment material concerning one of the state's trial witnesses. See *Vega* v. *Commissioner of Correction*, 224 Conn. App. 652, 661–62, 312 A.3d 1142 (2024). The petitioner, Miguel Vega, asks us to conclude that *Brady* required the prosecutor in his criminal case to disclose a state's witness' prior false testimony in an unrelated trial, which the petitioner contends was exculpatory and material to his criminal trial. We disagree with the Appellate Court's conclusion that the prosecutor had no actual knowledge or cause to know of the existence of *Brady* material and, therefore, had no responsibility to search for, locate, and disclose impeachment material in an unrelated case unless the petitioner had specifically requested the information. Our confidence in the outcome of the petitioner's criminal trial, however, is not undermined by the state's nondisclosure. Accordingly, we agree with the respondent, the Commissioner of Correction, that there was no due process violation because the state's failure to disclose was immaterial under *Brady*. We therefore affirm the Appellate Court's judgment on this alternative basis.

I

A

The petitioner's habeas petition arises out of events the Appellate Court recounted in his direct appeal from his conviction; see *State* v. *Vega*, 181 Conn. App. 456, 459–62, 187 A.3d 424, cert. denied, 330 Conn. 928, 194 A.3d 777 (2018); summarized for our purposes as follows. On the night of March 2, 2010, Michael Ellis, Jr. (Ellis), Altareika Parrish, Rahmel Perry, Shariymah James, Alice Phillips, Keyireh Kirkwood, and others gathered at an apartment in New London. Id., 459. At about midnight on March 3, some members of the group left the apartment and went to a bar where the petitioner

was present with a few of his acquaintances. Id. At the bar, Ellis stood next to Kirkwood. Id. Kirkwood and the petitioner have a child together. Id. The petitioner motioned for Ellis to step away from Kirkwood, and, when Ellis refused, the petitioner approached Ellis and punched him in the face. Id., 459–60. A fight broke out between the two groups, during which Perry punched and kicked the petitioner. Id., 460. When the fight broke up, the groups exited the bar, and another brief altercation ensued outside. Id.

At approximately 1:30 a.m., Ellis, Parrish, Perry, Kirkwood, Phillips, and James returned to the New London apartment where Shauntay Ellis (Michael Ellis' cousin) and others were also present. Id. At about 2 a.m., the petitioner and another man entered the apartment, carrying firearms and dressed in all black clothing with their heads and faces covered. Id. The petitioner proceeded toward the living room, pulled down his mask and ordered everyone in the room to get on the floor. Id. The petitioner fired two gunshots toward a window in Ellis' direction, but the bullets did not strike Ellis. Id. The petitioner then fired two gunshots at Perry, who was on a couch, hitting him. Id. Ellis ran out of the room toward a back door where the intruders had entered, briefly scuffling with the second intruder, who appeared to reach for a gun. Id. Ellis went down a flight of stairs, exited the apartment, and ran down the street. Id., 460–61. The intruders followed Ellis, firing approximately four gunshots, hitting Ellis twice. Id., 461. Ellis flagged down a police officer and was transported to a hospital where he later recovered from his injuries. Id. At the apartment, Phillips called 911 and reported that Perry had been shot. Id. Shauntay Ellis and Phillips drove Perry to the hospital, where he succumbed to his injuries. Id. When the police arrived at the apartment, several people who had been present during the shooting identified the petitioner as one of the shooters. Id. The police attempted to locate the petitioner and obtained a warrant for his arrest. Id. Law enforcement officials

located the petitioner three and one-half months later in Georgia. Id.

The petitioner's first trial took place in 2015, in the judicial district of New London, and ended in a hung jury, after which the trial court declared a mistrial. Id., 462. Following a second trial in 2016, a jury found the petitioner guilty of various offenses, including murder in violation of General Statutes § 53a-54a (a), felony murder in violation of General Statutes § 53a-54c, and home invasion in violation of General Statutes § 53a-100aa (a) (2). Id., 462–63. The trial court sentenced him to a total effective term of seventy-five years of incarceration. Id., 463. The Appellate Court affirmed his conviction; id., 492; and we denied his petition for certification to appeal to this court.[1] See *State* v. *Vega*, 330 Conn. 928, 194 A.3d 777 (2018).

At the petitioner's second criminal trial, where he was represented by Robert Kappes and prosecuted by Michael L. Regan, then state's attorney for the judicial district of New London, the state presented several eyewitnesses, including Phillips. Each witness testified that the petitioner was the intruder and shooter. The jury heard a recording of Phillips' 911 call during which she identified the petitioner as the shooter who had killed Perry. Phillips testified that she saw the petitioner enter the living room with a gun, order everyone to get on the floor, and shoot toward Ellis before she dove onto the couch with Perry. Phillips also testified that she had a pending criminal case in Michigan at the time but that no promises had been made to her by the state in exchange for her testimony. During cross-examination, defense counsel questioned Phillips about several inconsistencies

[1] On direct appeal, the petitioner claimed that the trial court had (1) abused its discretion by admitting out-of-court statements as spontaneous utterances pursuant to § 8-3 (2) of the Connecticut Code of Evidence, (2) abused its discretion by excluding a letter that contained statements that were against the author's penal interest, and (3) improperly admitted hearsay statements from an unavailable witness in violation of his sixth and fourteenth amendment right to confrontation. *State* v. *Vega*, supra, 181 Conn. App. 459.

in her testimony, her statements to the police, and her testimony at both the petitioner's probable cause hearing and his first criminal trial.

B

The *Brady* material at issue in this case involves testimony given in 2009 by Phillips in an unrelated trial, also prosecuted by the state's attorney's office for the judicial district of New London, in which a jury found Kurtis Turner guilty of murder. The Appellate Court affirmed Turner's conviction, and we denied his petition for certification to appeal to this court. See *State* v. *Turner*, 133 Conn. App. 812, 844, 37 A.3d 183, cert. denied, 304 Conn. 929, 42 A.3d 390 (2012). At Turner's trial, Phillips testified for the state as a cooperating witness. *Turner* v. *Commissioner of Correction*, 181 Conn. App. 743, 749, 187 A.3d 1163 (2018). Prior to her testimony, the prosecutor, John P. Gravelec-Pannone, told Phillips that, if he believed she had testified truthfully, he would notify the prosecutor handling her then pending charges in Connecticut of her cooperation. Id., 750. The state paid for Phillips' plane fare from Michigan to Connecticut and her travel expenses so she could testify. Id. During her testimony, Phillips was asked if she hoped for any consideration, outside of travel expenses, in exchange for her testimony. Id. She answered, "no." Id. Gravelec-Pannone did not correct her answer. Id.

In May, 2015, eight months before Phillips testified in the petitioner's second criminal trial, Turner filed an amended petition for a writ of habeas corpus, alleging that his due process rights were violated by the prosecutor's knowing presentation of and failure to correct Phillips' allegedly false testimony at Turner's criminal trial. Id., 747. A habeas trial was held in September, 2015, approximately three months before the commencement of the petitioner's second trial. Id. During Turner's habeas trial, Gravelec-Pannone testified that no specific deal had been discussed between the state and Phillips in 2009. He agreed, however, that notifying the prosecutor in Phillips' pending cases of her cooperation was a

form of consideration. Id., 751. He indicated that he did not correct Phillips' testimony at Turner's murder trial that she did not expect any consideration beyond travel expenses because he was reluctant to impeach his own witness during direct examination. Id. The respondent, the Commissioner of Correction, maintained at Turner's habeas trial that no deals involving a resolution of Phillips' pending cases had been reached. One week after the petitioner's sentencing on March 15, 2016, in the present case, the habeas court in Turner's case denied his habeas petition, concluding that no exculpatory information had been withheld from Turner and that Phillips had not testified falsely at his criminal trial. See *Turner* v. *Warden*, Docket No. CV-13-4005268-S, 2016 WL 1444200, *1 (Conn. Super. March 23, 2016). Turner then appealed to the Appellate Court. See *Turner* v. *Commissioner of Correction*, supra, 181 Conn. App. 744. Two years later, in May, 2018, the Appellate Court reversed the judgment of the habeas court, holding that Gravelec-Pannone's failure to correct Phillips' false testimony that she did not expect any further consideration for her testimony violated Turner's due process right to a fair trial under *Brady*. See id., 753–58. The respondent did not petition this court for certification to appeal from the Appellate Court's judgment. At the time that Phillips testified in the petitioner's second criminal trial, therefore, there was a credible pending allegation that she had testified falsely in a case being handled by the same state's attorney's office.

C

In June, 2018, the petitioner filed his own petition for a writ of habeas corpus, which he amended in 2022. That amended petition alleged, among other things, that the state had violated *Brady* by failing to disclose Phillips' false testimony in Turner's trial. *Vega* v. *Commissioner of Correction*, supra, 224 Conn. App. 656–57. At the petitioner's habeas trial, Regan, the prosecutor at both of the petitioner's underlying criminal trials, testified that he had maintained an open file policy with the

defense and, "[s]o, whatever [Regan] had, [the] defense had." Therefore, Regan believed he had turned over all exculpatory material in his possession to the petitioner at that time. Regan recalled that Phillips was an important witness at the petitioner's criminal trial, but he did not specifically remember her testimony or recall whether he had disclosed to the defense any exculpatory information concerning Phillips. He also testified that, if a witness had committed perjury in another trial, he would have considered that to be exculpatory information and disclosed it to the defense. The petitioner's counsel at his second criminal trial also testified and stated that he had requested that the state disclose all exculpatory material, but he did not recall if anything was disclosed regarding Phillips.

The habeas court denied the petition, and the Appellate Court dismissed the petitioner's subsequent appeal, concluding that knowledge that Phillips previously had testified falsely in an unrelated case cannot be imputed to the prosecuting attorney in the petitioner's criminal trial. See *Vega* v. *Commissioner of Correction*, supra, 224 Conn. App. 660. In co concluding, the Appellate Court relied on this court's decision in *State* v. *Guerrera*, 331 Conn. 628, 646–49, 206 A.3d 160 (2019), in which we held that, absent a specific and limited request for the exculpatory information by the defense, a prosecutor did not have the duty to review 1552 recordings of telephone calls in the possession of the Department of Correction that neither the department nor the state had reviewed as part of its investigation. See *Vega* v. *Commissioner of Correction*, supra, 660–62.[2]

II

The petitioner claims that the prosecutor had an obligation to disclose to him the fact that Phillips had

[2] The Appellate Court also relied on the habeas court's alternative finding that, even if the prosecutor were required to disclose Phillips' false testimony, the evidence presented at the habeas trial did not establish that the state had failed to disclose it. See *Vega* v. *Commissioner of Correction*, supra, 224 Conn. App. 662 n.2. Because we hold that Phillips'

previously given false testimony in another trial as a state's witness because the scope of the prosecutor's obligation under *Brady* includes reviewing case files from his own office that involve a key witness in the petitioner's criminal trial, even if the cases are unrelated. The petitioner argues that the prosecutor's failure to disclose Phillips' prior false testimony constituted a *Brady* violation because Phillips was the state's most important witness at his criminal trial, and, consequently, her credibility was vital to the state's case against him. The respondent argues that the prosecutor had no obligation under *Brady* to review unrelated case files for potential exculpatory or impeachment material related to its own witnesses absent a specific request by the defense. Additionally, the respondent argues that Phillips' prior false testimony was immaterial given the strength of the state's case against the petitioner.

It is well established that due process principles require the prosecution to disclose evidence favorable to the accused when the evidence is material either to guilt or to punishment, irrespective of the good or bad faith of the prosecution. See, e.g., *Brady* v. *Maryland*, supra, 373 U.S. 87; see also *Demers* v. *State*, 209 Conn. 143, 149, 547 A.2d 28 (1988). To establish a *Brady* violation, a defendant must show that (1) the evidence is "favorable to the accused, either because it is exculpatory, or because it is impeaching," (2) the evidence was suppressed by the state either wilfully or inadvertently, and (3) the evidence was material to the case. *State* v. *Ortiz*, 280 Conn. 686, 717, 911 A.2d 1055 (2006); see also *Strickler* v. *Greene*, 527 U.S. 263, 281–82, 119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999). Impeachment evidence is broadly defined as "evidence having the potential to alter the jury's assessment of the credibility of a significant prosecution witness." (Internal quotation marks omitted.) *Adams* v. *Commissioner of Correction*, 309 Conn. 359, 370, 71 A.3d 512 (2013). "Whether the [petitioner] was deprived of

prior false testimony in the unrelated *Turner* case was immaterial, we do not reach the issue of whether the evidence establishes that the state failed to disclose it.

his due process rights due to a *Brady* violation is a question of law, to which we grant plenary review." (Internal quotation marks omitted.) *State* v. *Andres C.*, 349 Conn. 300, 329–30, 315 A.3d 1014, cert. denied, . . . U.S. . . ., 145 S. Ct. 602, 220 L. Ed. 2d 236 (2024).

A

"As the state's representative, the prosecutor has a broad obligation to disclose *Brady* material because principles of fundamental fairness demand no less." (Internal quotation marks omitted.) *State* v. *Guerrera*, supra, 331 Conn. 647. We have often observed that prosecutors occupy a unique role in our judicial system; they are not ordinary participants in a criminal case but "high public officer[s], representing the people of the [s]tate, who seek impartial justice for the guilty as much as for the innocent." (Internal quotation marks omitted.) *State* v. *Andres C.*, supra, 349 Conn. 338. "[B]ecause the [prosecutor's] failure to turn over exculpatory material in its possession is unlikely to be discovered and thus largely unreviewable, it is particularly important for the prosecutor to ensure that a careful and proper *Brady* review is done." (Internal quotation marks omitted.) Id., 339. "[I]t is the obligation of the prosecutor, not the defendant or the courts, to ensure, in the first instance, that the principles of justice that underlie *Brady* are fully served." Id.

"The prosecution's duty to disclose applies to all material and exculpatory evidence that is within its possession *or available to it* . . . and that the prosecution knew or should have known was exculpatory." (Citations omitted; emphasis in original.) *Demers* v. *State*, supra, 209 Conn. 150–51. A prosecutor's duty to disclose under *Brady* indisputably "reaches beyond evidence in the prosecutor's actual possession." *United States* v. *Risha*, 445 F.3d 298, 303 (3d Cir. 2006); see also *Kyles* v. *Whitley*, 514 U.S. 419, 437, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995). Indeed, a prosecutor's "obligation extends to evidence favorable to the defense that is not in the possession of the individual prosecutor responsible for

trying the case [and] . . . may encompass such evidence even if it is not known to the prosecutor. . . . More specifically, the prosecutor's duty of disclosure extends to *Brady* material that is known to the others acting on the government's behalf in [the] case . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Guerrera*, supra, 331 Conn. 647. "[T]he propriety of imputing knowledge to the prosecution is determined by examining the specific circumstances of the person alleged to be an arm of the prosecutor." (Internal quotation marks omitted.) *United States* v. *Stewart*, 433 F.3d 273, 298 (2d Cir. 2006). In this context, "constructive possession" means that, "although a prosecutor has no actual knowledge [of the exculpatory material], he should nevertheless have known that the material at issue was in existence." *United States* v. *Joseph*, 996 F.2d 36, 39 (3d Cir.), cert. denied, 510 U.S. 937, 114 S. Ct. 357, 126 L. Ed. 2d 321 (1993).

Although the present case involves information known to different prosecutors in the same state's attorney's office, we find instructive cases analyzing the scope of a prosecutor's *Brady* obligation to seek out and disclose material impeachment evidence possessed by other governmental agencies regarding a witness the prosecutor intends to have testify. See, e.g., *United States* v. *Risha*, supra, 445 F.3d 306 ("a *Brady* violation may be found despite a prosecutor's ignorance of impeachment evidence . . . [especially] when the withheld evidence is under the control of a state instrumentality closely aligned with the prosecution" (internal quotation marks omitted)). In *United States* v. *Auten*, 632 F.2d 478 (5th Cir. 1980), the court declined to excuse the nondisclosure of a witness' prior convictions because the prosecution chose not to check the National Crime Information Center's (NCIC) database due to a lack of time before the witness was to testify at trial. See id., 481. The court held that the interests of inherent fairness require the prosecution to produce impeachment "evidence [that is] actually or constructively in its possession or accessible to it . . . ." (Internal quotation marks omitted.)

Id. Excusing nondisclosure "where the prosecution has not sought out information readily available to it . . . would . . . invit[e] . . . and plac[e] a premium on conduct unworthy of representatives of the [government]." Id.; see also *United States* v. *Perdomo*, 929 F.2d 967, 968 (3d Cir. 1991) (*Brady* violation occurred when prosecution failed to search local records for criminal background of government witness), overruled in part on other grounds by *Dennis* v. *Secretary, Pennsylvania Dept. of Corrections*, 834 F.3d 263 (3d Cir. 2016). Whether information is "readily available" to the prosecution is measured not "in terms of whether the information is easy or difficult to obtain but by whether the information is in the possession of some arm of the state." *United States* v. *Perdomo*, supra, 971.

Although a prosecutor need not undertake unreasonable, open-ended fishing expeditions to eliminate any possibility that *Brady* material exists, there is little doubt that the prosecution has an obligation to search for impeachment evidence outside of its possession pertaining to its own witnesses when it has reason to know such evidence may exist. See, e.g., *United States* v. *Joseph*, supra, 996 F.2d 41; see also *Kyles* v. *Whitley*, supra, 514 U.S. 437. *Kyles* and its progeny, however, do not address whether prosecutors in the same office are insulated from *Brady* disclosure obligations depending on whether they were involved in a particular case. See, e.g., *State* v. *Williams*, 392 Md. 194, 210–12, 896 A.2d 973 (2006).

In *Adams* v. *Commissioner of Correction*, supra, 309 Conn. 359, we noted that, in *Giglio* v. *United States*, 405 U.S. 150, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972), the United States Supreme Court "has . . . made plain that the prosecution cannot escape its disclosure obligation by compartmentalizing information or failing to inform others in the office of relevant information" and that a "prosecutor's office . . . is responsible as a corporate entity for disclosure." (Internal quotation marks omitted.) *Adams* v. *Commissioner of Correction*, supra, 372 n.17, quoting *Demjanjuk* v. *Petrovsky*, 10 F.3d 338, 353 (6th

Cir. 1993), cert. denied sub nom. *Rison* v. *Demjanjuk*, 513 U.S. 914, 115 S. Ct. 295, 130 L. Ed. 2d 205 (1994); cf. *State* v. *Hargett*, 343 Conn. 604, 627, 639–40, 275 A.3d 601 (2022) (state actors lacked due diligence when prosecutor was unaware of murder weapon discovered later in unrelated case handled by same state's attorney's office). Indeed, the Supreme Court in *Giglio* made clear that the prosecutor's office is treated as a single entity, and each prosecutor is charged with knowledge of information known to the office as a whole. See *Giglio* v. *United States*, supra, 154 ("[t]he prosecutor's office is an entity and as such it is the spokesman for the [g]overnment"); see, e.g., *United States* v. *Butler*, 567 F.2d 885, 889 (9th Cir. 1978); see also *Santobello* v. *New York*, 404 U.S. 257, 262, 92 S. Ct. 495, 30 L. Ed. 2d 427 (1971) ("[t]he staff lawyers in a prosecutor's office have the burden of letting the left hand know what the right hand is doing or has done" (internal quotation marks omitted)); *United States* v. *Bravo*, 808 F. Supp. 311, 320 n.10 (S.D.N.Y. 1992) ("as long as the [c]ourt finds that the United States [a]ttorney's [o]ffice had knowledge of the investigations, knowledge on the part of the [assistant United States attorney] will be presumed"); *State* v. *Etienne*, 163 N.H. 57, 90–91, 35 A.3d 523 (2011) (imputing knowledge among attorneys in state attorney general's office is reasonable).

B

The state's attorney's office for the judicial district of New London is a single entity that speaks for the state on criminal matters in that district. See *Giglio* v. *United States,* supra, 405 U.S. 154. Accordingly, the prosecution is not relieved of its *Brady* obligations simply because a prosecutor responsible for prosecuting a specific case is not personally aware of the existence of exculpatory evidence in the same state's attorney's office related to that case.[3] We therefore conclude that the prosecution's

---

[3] This case does not require us to determine whether knowledge of *Brady* material possessed by one state's attorney's office should be imputed to attorneys in a different state's attorney's office in another judicial

duty under *Brady* extended in this case to information concerning its own witness that, although unknown to the attorney prosecuting the petitioner's criminal charges, was known to another prosecutor within the New London state's attorney's office in an unrelated matter.

In reaching the opposite conclusion, the Appellate Court relied on this court's decision in *State* v. *Guerrera*, supra, 331 Conn. 628, in holding that, because no evidence was adduced that Regan had actual knowledge or reason to know of the impeachment evidence regarding Phillips in an unrelated case, the petitioner's trial counsel had to make a specific request that explicitly identified the material to trigger an examination of the unrelated case files. See *Vega* v. *Commissioner of Correction*, supra, 224 Conn. App. 661–62. The Appellate Court's reliance on our decision in *Guerrera* as applied to the petitioner's case is misplaced.

In *Guerrera*, this court addressed the question of whether the prosecution had to review for *Brady* material recordings of 1552 phone calls and noncontact visits of the defendant and his codefendants, all of whom were incarcerated, which the Department of Correction automatically recorded for administrative purposes and safety concerns. See *State* v. *Guerrera*, supra, 331 Conn. 634–35, 646. In that case, the Department of Correction possessed the recordings, which neither it nor the state's attorney's office had reviewed. See id., 635–36. We disagreed with the Appellate Court's conclusion that the state had an obligation to review the calls and held that the Appellate Court's conclusion was based on an assumption, unsupported by the record, that the unreviewed calls were part of the state's investigatory file. See id., 655. Because the recordings of the calls were not in the prosecution's possession and could not reasonably be characterized as part of the state's investigatory file under the circumstances in *Guerrera*, we concluded that the prosecutor was not required to review those call

district, a determination that would depend on the circumstances of the case. We leave that question for another day.

recordings. See id., 655–56. The present case is readily distinguishable from *Guerrera*.

*Guerrera* involved a request by the defense in the form of a subpoena to search the records of a state agency's files, namely, the Department of Correction's computer servers—a search that otherwise would not be performed. See id., 655. Relying on *Kyles* and its progeny, which addressed when a prosecutor has a duty to learn of exculpatory evidence in the possession of any entity acting on behalf of the state in connection with a particular investigation, we determined that the scope of the search required under the Appellate Court's holding—a review of more than 1500 recordings of calls and visits in the possession of another state agency, generated according to the Department of Correction's administrative policies without any reason to believe they contained exculpatory information—constituted too broad a construction of the prosecution's obligation under *Brady*. See id., 649, 655. Our decision in *Guerrera* did not, however, address whether the prosecution has a duty in a particular case to search files within *its own office* for potentially exculpatory information related to the state's own trial witness. That is the issue we face in this case.

Relying primarily on *Guerrera* and the decision of the United States Court of Appeals for the Third Circuit in *United States* v. *Joseph*, supra, 996 F.2d 36, as well as cases that address the prosecution's responsibility to review records in the possession of other state agencies, the respondent argues that a prosecutor has no responsibility to search unrelated files of his own office of the state's attorney for exculpatory material absent a specific request by the defense. In *Joseph*, narcotics agents had testified that they began surveillance between 6 and 6:30 p.m., which led to a raid that resulted in the defendant's arrest. Id., 38. After the jury returned a verdict, the prosecutor became aware of reports and affidavits that the narcotics agents had prepared and signed in an unrelated case the prosecutor had handled that contradicted the time at which the narcotics agents

claimed to have begun their surveillance of the defendant in *Joseph*. Id. The Third Circuit reasoned that, under the circumstances of that case, the prosecutor had no cause to know of the contradictions in the two unrelated cases. See id., 40. The court considered that the reports and affidavits contradicting the narcotics agents' testimony had been developed in a case that resolved with a guilty plea, providing the prosecutor with no occasion to become familiar with all of the information in the file of that unrelated case, as well as the differences in the cases and the fact that the time when surveillance commenced in *Joseph* was not an important element of the defendant's case. See id. The court in *Joseph* reasoned that a finding of constructive knowledge would have imposed a duty to engage in open-ended fishing expeditions into all of a prosecutor's "unrelated files to exclude the possibility, however remote, that they contain exculpatory information." Id., 41; see also *Morgan* v. *Salamack*, 735 F.2d 354, 358 (2d Cir. 1984) (no obligation to seek out impeachment evidence for prosecution witness when evidence is not probative of defendant's innocence, not in prosecutor's file and not in possession of prosecutor's office).

The circumstances of the present case differ substantially from those in *Joseph*. The exculpatory evidence in *Joseph* was found in subtle details of the testimony and reporting of two narcotics agents. Our decision in the present case does not impose a burden requiring that a prosecutor review and cross-reference the trial transcripts and reports of investigators who testify in more than one case—often, perhaps, in many cases—for potentially exculpatory discrepancies, absent a specific trigger or request. In contrast to the situation in *Joseph*, the exculpatory evidence regarding Phillips in the present case was not so remote in relevance or scope that it was unreasonable to require the prosecution to have sought it out and disclosed it. Rather, the evidence was possessed by same state's attorney's office in New London. Furthermore, the evidence pertained to the same civilian witness the state called to testify in two unrelated murder

cases, both of which proceeded to trial, whose testimony in one of those trials was the subject of an ongoing habeas proceeding handled by a senior assistant state's attorney, one of approximately twelve prosecutors from the same office. See Division of Criminal Justice Data Report: New London JD (2024) p. 1 (Criminal Justice Data Report), available at https://portal.ct.gov/dcj/-/media/dcj-beta/data-reports/2025/new-london-data-report-2024.pdf (last visited April 20, 2026). The prosecutor's obligation in the present case merely required that he make a thorough inquiry into his own office's files regarding a trial witness. See, e.g., *Giglio* v. *United States*, supra, 405 U.S. 154.

Turner filed a habeas petition in May, 2015, months after Phillips had testified at the petitioner's first trial, which ended in a mistrial. Turner alleged that Phillips had provided false testimony at his criminal trial. Turner's habeas trial then took place from September 28 to 30, 2015, with the veracity of Phillips' testimony at the 2009 trial front and center among Turner's claims that he had been deprived of a fair trial. Three months later, on January 11, 2016, the same state's attorney's office that defended against Turner's habeas corpus claims again called Phillips to testify at the petitioner's second criminal trial. Although Phillips' testimony at the petitioner's second criminal trial took place prior to the habeas court's March 23, 2016 decision on Turner's habeas petition, the New London state's attorney's office was almost simultaneously preparing for and defending against Turner's habeas petition regarding Phillips' false testimony while it was preparing to have Phillips testify at the petitioner's second criminal trial. Thus, the allegation that a witness in the petitioner's second criminal trial had testified falsely was not tucked away in a distant filing cabinet in a remote wing of another state agency or hidden in the details of trial transcripts and affidavits in an investigator's unrelated cases. Rather, only a little more than three months after defending against a habeas petition regarding Phillips' false testimony in Turner's case, and while the habeas court's decision in

Turner's case was still pending, the New London state's attorney's office put Phillips back on the witness stand to testify against the petitioner in his second criminal trial, without disclosing to the petitioner that the veracity of Phillips' testimony was the subject of ongoing litigation.[4] The prosecutor may not avoid his *Brady* obligations to disclose evidence favorable to the defense under these circumstances merely because the evidence existed in another case that was handled by a different attorney. See *Adams* v. *Commissioner of Correction*, supra, 309 Conn. 372 n.17.

We do not need, in the present case, to construct rigid boundaries around the scope of a prosecutor's duty under *Brady* to seek out and disclose exculpatory evidence in unrelated files in the possession of any state's attorney's office, but we decline to relieve the prosecution of its *Brady* obligations simply because exculpatory evidence exists in an unrelated case being litigated by a colleague in the same office. We are satisfied that, under the circumstances of this case, the prosecutor should have known about the accusation that Phillips had testified falsely and disclosed it to the defense, or, at a minimum, requested that the trial court undertake an in camera review of the available information to determine whether disclosure to the defense was required.

Our conclusion in this case that the prosecutor was required to review an unrelated case file in his own office for exculpatory or impeachment material related to a trial witness does not impose an unreasonable burden on the state. This case does not present a situation that would require a potentially unlimited fishing expedition into all

---

[4]The respondent argues that the prosecution could not have had cause to review Phillips' involvement in Turner's case because the Appellate Court did not determine that Phillips' testimony in Turner's case was false until the court issued its decision in 2018. See *Turner* v. *Commissioner of Correction*, supra, 181 Conn. App. 743. We are not persuaded. Here, Turner's habeas petition—in which Phillips' allegedly false testimony was a central issue—was still pending during the petitioner's criminal trial, a fact that we conclude should have been disclosed to the defense.

files possessed by any state's attorney's office to exclude the possibility that any exculpatory evidence might exist. Our holding today merely recognizes the accepted rule that the prosecution must make a thorough inquiry into its own witnesses. See, e.g., *United States* v. *Thornton*, 1 F.3d 149, 158 (3d Cir.), cert. denied, 510 U.S. 982, 114 S. Ct. 483, 126 L. Ed. 2d 433 (1993). The Division of Criminal Justice already requires prosecutors, before trying their cases, to "ascertain whether [their] witnesses have pending cases and/or recent convictions in other judicial districts; inquire whether any offers have been made (by the state or the court) in connection with those cases; and, if so, disclose any inducement to the defense." (Emphasis omitted.) Office of the Chief State's Attorney, Division of Criminal Justice Policies and Procedures (August 14, 2024) Policy 512a (Policy Regarding Disclosure of Exculpatory and Impeachment Evidence), p. 4, available at https://portal.ct.gov/cid/-/media/dcj-beta/policies/512a-policy-regarding-disclosure-of-exculpatory--impeachment-evidence.pdf (last visited April 20, 2026); see also id., p. 5 ("*Brady* and *Giglio* impose an independent obligation on you, as the prosecutor, to seek out and timely disclose exculpatory impeachment information").

We do not ourselves have—and have not been provided with—a thorough understanding of the mechanics of the databases presently used by the state's attorney's offices and other arms of the state to maintain records on witnesses. To the extent that a significant burden is imposed on the state's attorney's offices by requiring prosecutors to inquire into witnesses' backgrounds to discover ongoing litigation regarding their testimony in an unrelated case handled by the same state's attorney's office,[5] "procedures and regulations can be established to

[5] Requiring a prosecutor to review the files of other attorneys at the same state's attorney's office under these circumstances is no more burdensome than the duties we impose on attorneys within the same law firm and within offices of the government in other contexts for the purpose of disclosing conflicts of interest so as to comply with their ethical obligations. See Rules of Professional Conduct 1.0, commentary; A.B.A., Model Rules of Professional Conduct (2018) rule

carry the [prosecutor's] burden . . . ." (Internal quotation marks omitted.) *Kyles* v. *Whitley*, supra, 514 U.S. 438.

### III

We cannot conclude that the prosecutor's failure to disclose Phillips' prior false testimony violated the petitioner's due process rights and rises to the level of a *Brady* violation unless the evidence was material. See, e.g., *Adams* v. *Commissioner of Correction*, supra, 309 Conn. 370. Determining materiality presents a question of law, subject to plenary review. See, e.g., *Marquez* v. *Commissioner of Correction*, 330 Conn. 575, 593, 198 A.3d 562 (2019); *State* v. *Ortiz*, supra, 280 Conn. 720.

Evidence is material only when there is "a reasonable probability of a different result if the evidence had been disclosed." (Internal quotation marks omitted.) *State* v. *Jordan*, 314 Conn. 354, 370, 102 A.3d 1 (2014). The "mere *possibility* that an item of disclosed evidence *might* have helped the defense or *might* have affected the outcome of the trial, however, does not establish materiality . . . ." (Emphasis in original; internal quotation marks omitted.) *State* v. *Ortiz*, 252 Conn. 533, 546, 747 A.2d 487 (2000). "A reasonable probability of a different result is accordingly shown when the government's

1.0, comment [3], p. 9 (members of a law department, including the government, constitute a firm within the meaning of the rules). In the age of electronic records and databases, and especially considering the modest size of the state's attorney's office in the New London judicial district (approximately twelve attorneys); see Criminal Justice Data Report, supra, p. 1; we cannot assume that governmental actors are without the resources necessary to comply with disclosure obligations.

What we very recently have observed about the state's discovery obligations applies just as much to the state's *Brady* obligations: "[W]e are many years removed from a time when governmental actors, sometimes (but not always) without all the resources of the private sector or some larger governmental entities, are resigned to rely on primitive tickler systems, handwritten notes, or an individual employee's memory to comply with [their *Brady*] obligations. . . . A particular prosecutor's or staff person's negligence in failing either to ask for or to forward the evidence at issue can simply no longer constitute an acceptable excuse for the state's lack of compliance with its [*Brady*] obligations to the defendant's detriment." *State* v. *Hargett*, supra, 343 Conn. 641.

evidentiary suppression undermines confidence in the outcome of the trial." (Internal quotation marks omitted.) *Adams* v. *Commissioner of Correction*, supra, 309 Conn. 370–71. When "a conviction depends entirely upon the testimony of a certain witness . . . information affecting their credibility is material in the constitutional sense . . . ." (Citation omitted; internal quotation marks omitted.) *Demers* v. *State*, supra, 209 Conn. 161–62. However, when the state's case is otherwise strong and the witness' testimony, even if significant, is not dispositive, nondisclosure will not undermine confidence in the jury's verdict. See, e.g., *State* v. *Ortiz*, supra, 280 Conn. 722–23; see also *Strickler* v. *Greene*, supra, 527 U.S. 294, 296 (record provided strong support for conclusion that petitioner would have been convicted, even if witness had been severely impeached or witness' testimony had been excluded entirely).

We agree with the Appellate Court that there is no reasonable probability that disclosure of Phillips' prior false testimony would have changed the outcome of the petitioner's criminal trial. As Regan testified during the petitioner's habeas trial, Phillips was an important witness for the state. However, her testimony was far from dispositive. The state presented four other eyewitnesses[6] who knew the petitioner and identified him as the intruder and shooter. The state also presented evidence of the bar fight preceding the shooting and evidence of the petitioner's flight to Georgia following the shooting. Moreover, Phillips' credibility was extensively impeached

---

[6] Shauntay Ellis testified that the petitioner had kicked down the door of the apartment, told people to get on the floor, and held up a gun. Although she hid in a closet during the shooting, she heard screaming, gunshots, and Kirkwood yelling at "Mikey," a nickname for the petitioner, to stop. Parrish, a resident of the New London apartment, identified the petitioner as one of the intruders and saw him fire a gun. James identified the petitioner as her son's godfather, although "not in an official way," and testified that the petitioner was one of the intruders who lowered his mask and fired a gun into the living room. Ellis testified at the petitioner's probable cause hearing and first criminal trial that the petitioner had entered the apartment with a gun and shot toward a window. Although he refused to testify at the petitioner's second criminal trial, his earlier testimony was read to the jury.

on cross-examination. Defense counsel questioned Phillips about discrepancies in her original statements to the police, her 911 call, and her prior testimony in the petitioner's first criminal trial, as well as her level of intoxication on the evening of the shooting. The jury had ample information by which to judge the credibility of Phillips' testimony. We therefore conclude that there is no reasonable probability that disclosure of Phillips' prior false testimony in the unrelated Turner trial regarding the consideration she expected to receive for testifying in Turner's case undermines our confidence in the jury's verdict and the fairness of the petitioner's criminal trial.

The judgment of the Appellate Court is vacated only with respect to that court's determination that the prosecutor had no responsibility to seek out and to disclose to the defense information that a state's witness at the petitioner's criminal trial had previously given false testimony at another trial; the judgment of the Appellate Court is affirmed in all other respects.

In this opinion the other justices concurred.